# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CITY OF LEOMINSTER**, *Plaintiff,* v. **OSHKOSH CORPORATION, PIERCE MANUFACTURING, INC., REV GROUP, INC., ROSENBAUER AMERICA LLC, FIRE APPARATUS MANUFACTURERS' ASSOCIATION** *Defendants.* | Civil Action No. 4:26-cv-40152 _____ **COMPLAINT** **JURY TRIAL DEMANDED** |

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

PARTIES ...................................................................................................................... 5

    A.   Plaintiff City of Leominster .................................................................................. 5

    B.   Defendants ............................................................................................................ 8

        1.   REV Group, Inc. ............................................................................................. 8

        2.   Oshkosh Corporation and Pierce Manufacturing, Inc. ................................. 10

        3.   Rosenbauer America LLC ............................................................................. 12

        4.   The Fire Apparatus Manufacturer's Association .......................................... 13

JURISDICTION AND VENUE ................................................................................... 13

FACTUAL ALLEGATIONS ....................................................................................... 15

    A.   Background ......................................................................................................... 15

        1.   Brief History ................................................................................................. 15

        2.   Fire Truck Manufacturing Industry .............................................................. 16

    B.   REV Group, Oshkosh, and Rosenbauer start rolling up fire truck manufacturers ........... 17

    C.   Manufacturer Defendants collude to Suppress Competition ............................... 30

    D.   Manufacturer Defendants exchange confidential, competitively sensitive information through FAMA ............... 31

    E.   Supply Suppression and Price Inflation Resulting from Defendants' Conspiracy ........... 48

    F.   Market Power and Barriers to Entry ................................................................... 60

    G.   Plaintiff has been harmed as a result of the conspiracy ..................................... 65

    H.   Defendants actively concealed the conspiracy, and Plaintiff could not discover their anticompetitive product. ........... 71

CAUSES OF ACTION .................................................................................................. 73

COUNT I ....................................................................................................................... 73

Violations of Section 1 of Sherman Act, 15 U.S.C. §1- Conspiracy to Restrict Production ........ 73

COUNT II: ..................................................................................................................... 76

Violation of Section 1 of the Sherman Act, 15 U.S.C. §1- Conspiracy to Exchange Competitive Information ......... 76

COUNT III...................................................................................................................... 79

Violation of Massachusetts Antitrust Law, Mass. Gen. Laws Ch. 93, § 4 ................................... 79

COUNT IV ............................................................................................................................ 80

Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A §1, §§ 2 and 11 Et Seq. ...................................................................................................................... 80

COUNT V ............................................................................................................................. 82

Unjust Enrichment ............................................................................................................... 82

ANTRITRUST INJURY ...................................................................................................... 84

REQUEST FOR RELIEF ..................................................................................................... 85

DEMAND FOR JURY TRIAL ............................................................................................. 86

Case 2:26-cv-01105-WCG    Filed 06/08/26    Page 3 of 89    Document 1

## INTRODUCTION

1.      This is a Complaint brought by Plaintiff the City of Leominster, Massachusetts ("Leominster"). Defendants' unlawful conduct caused Plaintiff to pay artificially inflated, supercompetitive prices for fire trucks, prices far higher than it would have paid in a truly competitive market.

2.      Fire fighting vehicles have existed since 1700, beginning with hand-pulled carts and horse-drawn engines, progressing to steam-powered vehicles, and modernizing with gasoline engines around 1905-1910, which led to the first fully integrated motorize pumpers and ladder trucks, also known in today's modern world as "fire trucks".

3.      Fire trucks are the moving life-saving vehicles that brave firefighters rely on to protect life and property and have long been at the forefront of public safety all around the United States, including Massachusetts and Leominster.

4.      Leominster's Fire Department's mission is to provide emergency fires, rescue, and emergency medical services. Effective and proactive response to structural fires, hazardous material incidents, medical emergencies, rescues, and other catastrophic events depend on access to essential equipment, such as fire trucks, to safeguard the public.

5.      Fire trucks represent a substantial financial investment.  Over time, the cost of acquiring and maintaining these vehicles has increased dramatically.  Prices have doubled over the past decade, with some vehicles now costing between $1 million and $2 million each.  Fire departments across the nation have experienced staggering increases: the price of a new fire engine rose from approximately $450,000 in 2020 to $990,000 in recent years. In some cases, purchase orders from 2021 were initially locked in at around $840,000, but current estimates exceed $1

1

million. On average, the cost of acquiring a new fire truck has risen from $700,000 in 2020 to over $ 1 million in 2025.

6. Since 2005, Massachusetts Fire Departments, including Leominster, have operated with many older vehicles that have been past their prime. Many have had to rely on unpredictable federal and local grants, temporary tax increases that have not always been approved by residents, mutual partnership between communities, purchase of used vehicles from other departments or spend money on extending the firetrucks lifetimes through refurbish and maintenance.

7. Leominster back then faced about 8,000 incidents a year which had tripled in time and were forced to use fire trucks they had acquired over 25 years ago. Currently, the city is auctioning three trucks dating back to the 1980's.

8. Even if that alone were insufficient, over the years and still today, Massachusetts fire departments have suffered immense backlogs of average delivery times roughly up to three or four years, placing the firefighters and the public safety at risk.

9. These operational strains are heightened by nationally recognized safety and performance standards. The National Fire Protection Association ("NFPA") recommends that firetrucks be replaced after 15 years and reserved fire truck units after 25 years. Departments relying on vehicles well beyond these benchmarks risk failing out of compliance with NFPA standards and ISO rating criteria, as outdated equipment routinely counts against them during audits and recertifications. Moreover, older fire trucks often lack essential modern safety features, such as airbags and electronic stability control, leaving firefighters and Leominster's community exposed to avoidable dangers.

10. In April 2025, Massachusetts U.S. Senator Elizabeth Warren, together with Indiana Senator Jim Banks, initiated an investigation into the detrimental effects of private equity roll-ups

in the fire truck manufacturing industry. The two senators sent a letter to the International Association of Fire Fighters ("IAFF") requesting information regarding the adverse impacts on firefighters and the communities of Massachusetts and Indiana. In response, the IAFF provided testimony and submitted comments to the Federal Trade Commission ("FTC") and the Department of Justice ("DOJ") urging a formal investigation.

11. Fire truck manufacturers- REV Group, Inc. ("REV Group"), Oshkosh Corporation ("Oshkosh"), and Rosenbauer America LLC ("Rosenbauer") ("collectively known as Manufacturer Defendants") and the Fire Apparatus Manufacturers' Association ("FAMA") are responsible for increasing fire truck prices and perpetuating lengthy backlogs. Manufacturer Defendants control between 70 and 80 percent of the U.S. fire truck market and have unlawfully conspired with FAMA to suppress the fire truck supply and raise prices.

12. FAMA and the Manufacturer Defendants operate a closed information exchange system built on highly sensitive, non-public economic data. Manufacturer Defendants submit confidential pricing, cost, and production information to FAMA, which then transmits the data to a third-party consultant for compilation into industry reports.

13. Those reports are circulated only to FAMA members, including Manufacturer Defendants, and are not available to buyers, the public, or any FAMA non-members. FAMA also hosts annual, members-only meetings where Manufacturer Defendants can communicate directly with one another in a private forum.

14. Through this restricted exchange of competitively sensitive information, Manufacturer Defendants monitor each other's pricing and output decisions and maintain coordinated price increases and production limits. The data shared through FAMA is not the type of information that competitors would exchange in a competitive market.

15. This secrecy creates a significant information disparity: Buyers like Leominster have no access to the data that manufacturers use to shape market-wide pricing. This disparity is particularly harmful because the fire-truck market is highly concentrated, with only a small number of manufacturers controlling supply and facing substantial barriers to new competition.

16. FAMA and the Manufacturer Defendants are responsible for raising prices, protecting market share, and increasing margins without fear of competitive pressure or potential competitors.

17. As a result of FAMA and Manufacturer Defendant's unlawful conduct, Plaintiff paid artificially inflated, supercompetitive prices for fire trucks, prices far higher than they would have paid in a truly competitive market. FAMA and Manufacturer Defendant's conspiracy directly harmed Leominster by forcing them to keep unsafe and old emergency vehicles for extended periods of time, purchase vehicles at unlawfully elevated prices affecting budget constraints and left to use old fire trucks, endangering the lives of the firefighters and the community.

18. Accordingly, Leominster, individually and on behalf of all others similarly situated, brings this action to hold FAMA and Manufacturer Defendants accountable for their coordinated scheme. Claims are asserted under federal and state antitrust laws alleging that FAMA and Manufacturer Defendants' conduct constitutes a violation under both per se principles and, in the alternative, the rule-of reason framework.

4

## PARTIES

### A. Plaintiff City of Leominster

19.  The City of Leominster ("Leominster") is a city with an estimated population of approximately 43,627[1] located in Worcester County, North Central of Massachusetts, USA.[2]

20.  The Leominster Fire Department has four fire stations, staffing 85 full-time firefighters, 19 per shift[3] providing emergency fire and rescue services, emergency medical services and public and education safety.[4]

21.  Leominster has procured fire trucks from Manufacturer Defendant, Pierce Manufacturing Inc, for its fire department since 2012. Firetrucks purchase include custom built firetrucks such as Fire Apparatus F.Y. 2017 (1,500 g.p.m) New, Custom Built, Triple Combination Pumper; Fire Apparatus F.Y. 2015 New, Custom Built, Heavy Duty, Aerial Ladder Truck; Pierce Arrow XT Chassis Engine 2; Pierce Arrow XT 1500 GPM Pumper; and Pierce Wildland 1000 GPM built on an International Chassis.

---

[1]  City of Leominster, Massachusetts. Massachusetts Municipal Association. https://www.mma.org/community/leominster/ (last visited on June 5, 2026).

[2]  Leominster Massachusetts, United States. Britannica. https://www.britannica.com/place/Leominster-Massachusetts (last visited on June 5, 2026).

[3]  *See* stationsSMARTS, *Q&A with Leominster MA Fire Chief Robert Sidel,* YouTube (October 20, 2021), https://youtu.be/o8xHwmY2-eM?si=1tsUQw-UxS4N2eo3 (last visited on June 5, 2026).

[4]  Leominster Massachusetts. Fire Department. https://www.leominster-ma.gov/260/Fire-Department#:~:text=The%20Leominster%20Fire%20Department%27s%20mission%20is%20to,base%20*%20Achieving%20national%20standards%20and%20guidelines (last visited on June 5, 2026)



*Figure 1: Pierce Arrow XT Engine 3*



*Figure 2: Pierce Arrow XT Pumper[5]*

---

[5] Pierce. Leominster Fire Department- Pumper. https://www.piercemfg.com/customers/new-deliveries/leominster-fire-department-pumper-31050 (last visited on June 5, 2026)

6



***Picture 3: Pierce Leominster Arrow XT™ Custom Pumper from Pierce Manufacturing Company.[6]***

22.     In 2012, Leominster purchased a fire truck custom built by Manufacturer Defendant, Pierce Manufacturing in Appleton, Wisconsin at a net purchase of $475,445, with additions that increased the cost to $600,000.[7] The reason was to replace an Engine 3 fire truck that was built in 1995, with approximately 130,000 miles. The city paid from its reserves, using insurance and performance bonds, as a result of a procuring process in which Pierce won the project over two other bidders, Seagrave and KME.[8]

23.     The Plaintiff's Mayor has had to place money aside to purchase new engines. Engines used to cost less than $1 million , now they cost as much as $2 million.

---

[6]     Pierce. Leominster Fire Department-Pumper. https://www.piercemfg.com/customers/new-deliveries/leominster-fire-department-pumper-38228   (last visited on June 5, 2026).

[7] Jack Minch. *Truck on order to join Mass. Fleet.*, The Sentinel & Enterprise.   FireRescue1. (February 17, 2012).         https://www.firerescue1.com/fire-products/fire-apparatus/articles/truck-on-order-to-join-mass-fleet-fcE3B3MxiJdZJAmJ/ (last visited on June 5, 2026).

[8] *Id.*

7

24. Plaintiff experienced delays in receiving the firetruck. During this period, Plaintiff incurred costs to repair existing fire engines and was required to provide mutual aid to other fire departments by lending their ladder to serve emergencies.

## B. Defendants

### 1. <u>REV Group, Inc.</u>

25. Defendant REV Group, Inc. ("REV Group") is a general domestic corporation incorporated under the laws of Delaware[9] and headquartered in Brookfield, Wisconsin.[10]

26. REV Group companies are leading designers, manufacturers and distributors of specialty vehicles and related aftermarket parts and services in the markets they operate. REV Group companies are a diversified customer base, primarily in the United States,[11] through their Specialty Vehicles and Recreational Vehicle segments. They provide vehicle solutions for applications, including essential needs for public services such as ambulances and fire apparatuses, commercial infrastructure and consumer leisure.[12]

27. Defendant's products are sold to municipalities, government agencies, private contractors, consumers, and industrial and commercial end users.[13]

---

[9] REV Group, Inc, Annual Report SEC Form 10-K (December 10, 2025), at pg. 16, , https://fintel.io/doc/sec-rev-group-inc-1687221-10k-2025-december-10-20432-7080 (last visited on June 5, 2026)

[10] Rev Group, Inc. SEC Form 10K (Oct. 31, 2023), https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm#:~:text=REV%20Group,%20Inc.%20(Exact%20name%20of&text=Our%20principal%20executive%20offices%20are%20located%20at,Executive%20Drive,%20Suite%20100,%20Brookfield,%20Wisconsin%205300 05 (last visited on June 5, 2026)

[11] *Supra*, at Note 4.

[12] *Id.*

[13] *Id.*

28.  Defendant REV Group manufactures fire trucks operate under multiple brand names, including E-ONE, Inc. ("E-ONE"), Kovatch Mobile Equipment Corporation ("KME"), Ferrara Fire Apparatus ("Ferrara"), Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower")[14]. 113 dealers nationwide sell fire trucks from these brands across all 50 states.[15] Additionally, REV Group sells Spartan cabs and chassis to approximately 40 smaller builders.[16]

29.  Defendant REV Group currently operates manufacturing plants in Ocala, Florida (E-ONE apparatus), Hamburg, New York (stainless steel E-ONE products), Nesquehoning, Pennsylvania (KME apparatus), Ephrata, Pennsylvania (Ladder Tower, KME, and Ferrara apparatus) Brandon, South Dakota (Spartan pumpers), Charlotte, Michigan (Spartan cabs and chassis), Snyder, Nebraska (Smeal apparatus), and Holden, Louisiana (Ferrara apparatus).[17]

30.  In October 2025, REV Group entered into a definitive merger agreement with Terex Corporation[18] to merge "stock and cash transaction to form a leading specialty equipment manufacturer."[19]  This merger is set to "create a diversified leader in emergency, waste, utilities,

---

[14] REV Group Invests in Its Ephrata Facility to Increase Aerial and TDA Apparatus Production, FIREAPPARATUSMAGAZINE.COM (Feb. 28, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands (last visited June 5, 2026).

[15] *Id*.

[16] *Id*.

[17] Who We Are, REVGROUP.COM, https://revgroup.com/who-we-are (June 5, 2026).

[18] Terex Corp., Current Report (Form 8-K) (Oct. 30, 2025) (filed pursuant to Section 13 or 15 (d) at pg. 2-4. https://www.sec.gov/Archives/edgar/data/97216/000110465925104013/tm2529764d1_8k.htm (last visited on June 5, 2026).

[19] REV Vehicles. Terex and Rev Group Announces Strategic Merger, Creating A Leading Specialty Equipment Manufacturer; Terex Announces Plans to Exit its Aerial Segments (Oct. 30, 2025). 2025. https://investors.terex.com/news/news-details/2025/TEREX-AND-REV-GROUP-ANNOUNCE-STRATEGIC-MERGER-CREATING-A-LEADING-SPECIALTY-EQUIPMENT-MANUFACTURER-TEREX-ANNOUNCES-PLANS-TO-EXIT-ITS-AERIALS-SEGMENT/default.aspx (last visited June 5, 2026)

environmental and material processing equipment with attractive end markets characterized by low cyclicality, resilient demand and long-term growth profiles…"[20]

31.     Of the roughly $3 billion in annual fire truck sales in the United States, REV Group captures approximately $1 billion, or at least 33% of the total.11 In 2024, REV Group's full year net income was $257.6 million.[21]

### 2. **Oshkosh Corporation and Pierce Manufacturing, Inc.**

32.     Defendant Oshkosh Corporation ("Oshkosh") is a domestic business corporation incorporated in Wisconsin and is headquartered in Oshkosh, Wisconsin.[22]

33.     Defendant Oshkosh is a global industrial technology company that specializes in the design, development and manufacturing of purpose-built vehicles and equipment, "serving everyday heroes in the postal, firefighting, refuse and recycling collection, construction, aviation and defense industries."[23]

34.     Oshkosh sells its products in more than 150 countries under a variety of brand names, including JLG Industries, Inc., JerrDan LLC, Hinowa S.p.A, AUSACORP S.L., Oshkosh Aerotech, McNeilus Companies, Inc., Oshkosh Commercial Products, LLC, Iowa Mold Tooling Co., Inc., Maxi-Metal, Inc., Kewaunee Fabrications, LLC, Oshkosh Defense, LLC, and Pratt & Miller Engineering & Fabrications, LLC.[24]

---

[20] *Id.*

[21] Julie Nuernberg, REV Group, Inc. Reports Strong Fiscal 2024 Fourth Quarter and Full Year Results, REVGROUP.COM (Dec. 11, 2024), https://revgroup.com/rev-group-inc-reports-strong-fiscal-2024-fourth-quarter-and-full-year-results/ (last visited on June 5, 2026)

[22] Oshkosh Corporation, Annual Report SEC Form 10-K  at pg. 1 (December 31, 2024) https://www.sec.gov/Archives/edgar/data/775158/000095017025024305/osk-20241231.htm (last visited on June 5, 2026)

[23] Id.

[24] Oshkosh Defense Shows Expeditionary Power and Modernized Mobility at Modern Day Marine 2026 (April 27, 2026), https://oshkoshdefense.com/oshkosh-defense-shows-expeditionary-power-and-modernized-

35.     Oshkosh's leading North American brand is Pierce Manufacturing, Inc. ("Pierce"). Pierce is incorporated in Delaware and is headquartered in Appleton, Wisconsin.[25]   It is the leading North American manufacturer of custom fire apparatus. It produces custom and commercial pumpers, aerials, rescue trucks, wildland trucks, mini pumpers, and other fire apparatus in its manufacturing facilities in Appleton, Wisconsin and Bradenton, Florida.[26] Pierce has 26 dealers across California, Colorado, Florida, Kansas, Massachusetts, Minnesota, Mississippi, New Jersey, New York, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin.[27]  Together, this dealer network sells fire trucks to customers in all 50 states.

36.     Oshkosh, including Pierce, captures around $750 million in annual fire truck sales in the United States, or at least 25% of the total.[28]  Oshkosh's reported 2024 fourth quarter net income was $153.1 million.[29]  Pierce has an annual revenue of approximately $1 billion.[30]

---

mobility-at-modern-day-marine-2026/#:~:text=At%20Oshkosh%20(NYSE:%20OSK),information,%20visit%20oshkoshcorp.com  (last  visited  on June 5, 2026)

[25] Supra note 23.

[26] Pierce Manufacturing Joins Oshkosh Corporation to Showcase the Future of Electric Firefighting Technology at CES 2025, FIREAPPARATUSMAGAZINE.com (Dec. 23, 2024), https:// www.fireapparatusmagazine.com/industry-news/pierce-joins-oshkosh-to-showcase-the-future-          of-electric-firefighting-technology-at-ces-2025/ (last visited June5, 2026); Tour of Pierce Manufacturing, Inc., R4.IEEE.ORG, https://r4.ieee.org/event/tour-of-pierce-manufacturing-inc/ (last visited June 5, 2026)

[27] Find a Dealer, PIERCE.COM, https://www.piercemfg.com/find-a-dealer (last visited on June 5, 2026)

[28] Basel Musharbash, Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?, BIG BY MATT STOLLER Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll (last visited June 5, 2026)

[29] Oshkosh Corporation Reports 2024 Fourth Quarter and Full Year Results, OSHKOSHCORP.COM (Jan. 30, 2025), https://www.businesswire.com/news/home/20250129547598/en/Oshkosh-Corporation-Reports-2024-Fourth-Quarter-and-Full-Year-Results (last visited June 5, 2026)

[30] *Id.*

### 3. **Rosenbauer America LLC**

37.     Defendant Rosenbauer America LLC ("Rosenbauer") is a wholly owned subsidiary of Rosenbauer International AG ("Rosenbauer International"), a publicly traded company based in Austria and listed on the Vienna Stock Exchange.[31]  Rosenbauer is incorporated in Delaware[32] and headquartered in Lyons, South Dakota.[33]

38.     Defendant Rosenbauer has production facilities in Lyons, South Dakota; Wyoming, Minnesota; and Fremont, Nebraska. Rosenbauer produces custom and commercial pumpers, heavy rescues, tenders, mini pumpers and light rescues, aerial ladders and platforms, and electric fire trucks.[34]

39.     Defendant Rosenbauer has dealers across the country via access to their Dealer Portal[35]Together, these dealers sell fire trucks to customers in all 50 states.

40.     Defendant Rosenbauer captures approximately $307 million in United States fire apparatus sales annually,[36]  or at least 10% of the market.[37]

---

[31] Rosenbauer International Fully Acquires Rosenbauer America, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/en/company/investor-relations/financial-news/2022/06/rosenbauer-international-fully-acquires-rosenbauer-america(last visited on June 5, 2026)

[32] Del. Dep't of State, Div. of corps., Entity Details for Rosenbauer , America, LLC. https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx

[33] Rosenbauer America. Made in the USA-trusted worldwide, https://www.rosenbauer.com/en/contact/locations/america (June 5, 2026)

[34] Fire Apparatus Manufacturers Association. General Info. Rosenbauer America LLC FAMA.ORG, https://www.fama.org/members/company_profile/?id=99 (last visited on June 5, 2026)

[35] Rosenbauer. Dealership Portal. https://www.rosenbauer.com/en-us/company (last visited on June 5, 2026)

[36] Rosenbauer International Fully Acquires Rosenbauer America, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/en/company/investor-relations/financial-news/2022/06/rosenbauer-international-fully-acquires-rosenbauer-america (last visited June 5, 2026)

[37] Musharbash, *supra* note 28.

### 4. The Fire Apparatus Manufacturer's Association

41.     Defendant Fire Apparatus Manufacturers' Association ("FAMA") is a not-for-profit trade association for fire apparatus manufacturers, located in Ocala, Florida.[38]  As of May 2025, FAMA had 55 manufacturer members,[39]  including REV Group subsidiaries E-One, Ferrara, KME, and Spartan; Oshkosh subsidiary Pierce; and Rosenbauer.[40]  John Schultz, the Vice President and General Manager of Pumper Products at Pierce,[41]  is FAMA's vice-chair.[42]

42.     FAMA acted as a co-conspirator of the fire truck Manufacturer Defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data.

### JURISDICTION AND VENUE

43.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant:

   (a) Conducts business in the United States, including this District;

   (b) Manufactures, sells, ships, and/or delivers fire trucks to purchasing entities through

   the United States, including in this District;

   (c) Has substantial contacts with the United States, including in this District;

---

[38] How to Join, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/how-to-join/ (last visited June 8, 2026)

[39] FAMA Releases Fire Apparatus Industry Update, FIREENGINEERING.COM (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update/ (last visited June 5, 2026)

[40] Members List, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/members/list(last visited June 5, 2026)

[41]                    John                 Schultz,                    PIERCEMFG.COM, https://www.piercemfg.com/hubfs/FDIC%202025/Bios/Bio/John%20Schultz%20-%20Pierce%20Manufacturing.pdf (last visited June 5, 2026)

[42] Data & Research Committee, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee   (last visited June 5, 2026)

13

(d) and/or allegedly participated in an antitrust conspiracy directed at the United States that was intended to, and did foreseeably, cause injury to the business or property of persons residing in, located in, or doing business in the United States, including in this District.[43]

44. Defendants' activities were carried out in, intended to, and had direct, substantial, and reasonably foreseeable effects on interstate and foreign commerce within the United States.[44]

45. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331[45] and 1337[46] to secure injunctive relief and treble damages against Defendants for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1[47].

46. Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 28 U.S.C. §1391 (b), (c). One or more Defendants transacted business, were found or had agents in this District. A substantial part of the events giving rise to Plaintiff's claims occurred in this District, and a substantial portion of the affected interstate trade and commerce was carried out in this District.

47. This Court has supplemental jurisdiction over Plaintiff's state-law claim pursuant to 28 U.S.C. § 1367(a)[48] because the claim arises from the same case or controversy as the federal antitrust claims. Plaintiff seeks relief as is authorized by applicable Massachusetts state law.[49]

---

[43] Personal jurisdiction generally supported by minimum contacts, see *Int'l Show Co. v. Washington*, 326 U.S. 310 (1945).

[44] Interstate and foreign commerce effects required to establish Sherman Act jurisdiction, see 15 U.S.C. §1.

[45] 28 U.S.C. §1331 (granting federal-question jurisdiction).

[46] 28 U.S.C. §1337 (granting jurisdiction over civil actions arising under the federal commerce and antitrust laws).

[47] Sherman Act §1, 15 U.S.C. §1.

[48] 28 U.S.C. §1367(a) (supplemental jurisdiction)

[49] *See* A.R.S. §44-1408 (authorizing state-law antitrust claims)

14

48.     Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 28 U.S.C. §1391 (b), (c). One or more Defendants transacted business, were found or had agents in this District.  A substantial part of the events giving rise to Plaintiff's claims occurred in this District, and a substantial portion of the affected interstate trade and commerce was carried out in this District.

49.     Defendants' conduct, as alleged herein, substantially and foreseeably affected interstate commerce in the United States, including this District.

50.     Defendants sell fire apparatus and their services in the continuous and uninterrupted flow of interstate commerce, including in this District.

**FACTUAL ALLEGATIONS**

**A.  Background**

    **1.  <u>Brief History</u>**

51.     Historically in America, many laws existed requiring homeowners with hearths to keep buckets of water ready for fire emergencies.[50]  At the time, fire suppression efforts depended on individuals who assembled as a community to form human chains, passing "water from wells or springs"[51] to extinguish fires.   In time, however, as America entered the industrial age, technological advancements emerged and fire apparatus evolved and were manufactured differently.[52]

---

[50] Led Outfitters, *Fire Truck History and Modern Lighting*, https://ledoutfitters.com/blog/fire-truck-history-and-modern-lighting/?srsltid=AfmBOoqAxByy_8SaKJ_dHgFldkAia4NNHjYCGiTx0vobDDKGQk548-gW    (last visited June 5, 2026)

[51] Village of Carpentersville, IL, Firefighting Origins, https://www.cville.org/221/Firefighting-Origins#:~:text=In%20colonial%20American%20communities%2C%20each, United$20States$2C%20the%20Philadelphia%20Contributionship   (last visited June 5, 2026)

[52] The History of Fire Engines: From Primitive Pumps to Advanced Technology, https://www.bmefire.com/history-of-fireengines/#:~:text=As%20America%20moved%20into%20the,completely%20replaced%20by%20motorized%20pumpers (last visited June 5, 2026)

15

52. A "fire apparatus" is a vehicle designed to assist in firefighting and other rescue operations.[53] Fire apparatus consist of fire engines (pumpers, tenders, and tankers) , quint, water tender (tanker), and others as classified by the 2024 National Fire Protection Association ("NFPA") 1900 Standard for Aircraft Rescue and Firefighting Vehicles , Automotive Fire Apparatus, Windland Fire Apparatus and Automotive Ambulances[54] [55]

53. Demand for more water to fight bigger fires and respond to more dangerous emergencies increased and bigger engines were needed.  Thus, companies, such as American LaFrance Engine Company[56], began to emerge and started developing efficient and effective fire apparatus solutions to deal with emergencies, not just for firefighters but for the communities in both rural and urban areas.

## 2. Fire Truck Manufacturing Industry

54. After World War II, the fire truck manufacturing industry grew.  Small and midsized "fire truck manufacturers, typically family-owned operations, appeared in every region of the country to produce emergency vehicles tailored to the needs of local fire departments."[57] The industry was competitively diversified across a dozen companies.[58] Competition among

---

[53] City of San Marcos, Frequently Asked Questions, City of San Marcos, https//www.sanmarcostx.gov/m/faq?cat=31#question- (last visited June 5, 2026)

[54] Ambulances are not subject of this Complaint.

[55] NFPA 1900, Standard for Aircraft Rescue and Firefighting Vehicles, Automotive Fire Apparatus, Widland Fire Apparatus, and Automotive Ambulances (2024). https://nfpanorm.com/wp-content/preview/1900%202024.pdf (last visited June 5, 2026)

[56] America LaFrance Fire Engine Co. History and Overview. https://spaamfaa.org/encyclopedia-american-lafrance/#company_history (last visited June 5, 2026)

[57] Id.

[58] Letter to FTC and DOJ re Firetrucks, ECONOMICLIBERTIES.US (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited June 5, 2026)

16

"these smaller firms kept fire truck prices near costs, and the existence of a large number of manufacturers ensured redundant manufacturing capacity to meet demand."[59] The fire truck industry was competitively balanced for many years.   Prices remained relatively stable, increasing annually by about 3% adjusted for inflation.[60]

55.     After the Great Recession of 2008, municipal budgets were severely strained and the demand    for fire trucks and emergency vehicles sharply declined and remained subdued for years, disrupting the industry and encouraging some manufacturers to withdraw from the market.[61] In 2011, the market for new fire truck sales had fallen more than 40% from its peak,[62] from 5,000-6,000 a year to around 3,000 a year.[63]

**B. REV Group, Oshkosh, and Rosenbauer start rolling up fire truck manufacturers**

**1.    American Industrial Partners ("AIP"), and REV Group.**

56.     As a result of the Great Recession in 2008, AIP, an operationally orientated middle market private equity firm,[64] leveraged on the economic instability and purchased the fire apparatus company E-ONE, a leading fire apparatus manufacturer since 1974.[65]  -ONE built a full

---

[59] *supra* note 26

[60] *Id*.

[61] Basel J. Musharbash, Principal Attorney, Antimonopoly Counsel, Testimony Before the S. Comm. On Homeland Sec. & Gov't Affs., Subcomm. On Disaster Mgmt., Dist. Of Columbia, & Census, Sounding the Alarm: America's Fire Apparatus Crisis at 3 (Sept. 10, 2025). https://www.hsgac.senate.gov/wp-content/uploads/Musharbash-Testimony.pdf (June 5, 2026)

[62] Paul C. Darley, The Fire Apparatus Market is Coming Back… Just Look at the Data, FAMA.ORG (Dec. 5, 2015), https://www.fama.org/forum_articles (June 5, 2026)

[63] *supra* note 26.

[64] *Id.*

[65] E-One. About Us, https://e-one.com/about-us (June 5, 2026)

17

line of fire-fighting vehicles, from brush trucks and pumpers to aircraft rescue and firefighting vehicles.[66]

57. But E-ONE was not enough, as demand for fire trucks returned in the mid-2010s, and in 2015 there were still "approximately two-dozen companies producing motorized fire apparatus in the United States"[67], AIP decided to acquire and merge E-ONE and other several companies, into becoming REV Group.[68]



***Picture 4: REV Group[69]***

58. From 2016 to 2020, REV Group purchased other manufacturer companies such as Kovatch Mobile Equipment Corporation [70] ("KME") (2016), Ferrara Fire Apparatus,

---

[66] *Id.*

[67] Basel Musharbash, Did A Private Equity Fire Truck Roll-Up Worsen the L.A. Fires? (January 25, 2025). https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll ( June 5, 2026)

[68] *Supra*, Note 64.

[69] Fleetwood RV. REV Group Building Vehicles for Life. https://www.fleetwoodrv.com/about-rev-group-inc/ (June 5, 2026)

[70] REV Group Acquires Kovatch Mobile Equipment, REVGROUP.COM (Apr. 11, 2016), https://investors.revgroup.com/investor-releases/2016/11-04-2016 (last visited Aug. 15, 2025); Chris Mc Loone, REB Group Invests in the Strength of Fire Apparatus Brands, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ KME Fire Apparatus Sold REV Group, FIREHOUSE.COM (Apr. 22, 2016), https://www.firehouse.com/apparatus/press-release/12193362/fire-apparatus-manufacturer-kme-kovtach-pumpers-aerials-heavy-rescue-fire-apparatus-builder-kme-fire-apparatus-sold-to-revgroup (June 5, 2026)

Inc.("Ferrara') (2017), Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively known as "Spartan") (2019), Smeal Fire Apparatus ("Smeal") and Ladder Tower Company ("Ladder Tower") (2020)[71]. These acquired companies produced a broad array of fire apparatus, including but not limited to, pumpers, aerials, tankers, and others. [72]

59.     Out of all the acquired companies, Ferrara was the first one to solidify REV Group's position in the market.   Based in Holden, Louisiana[73] , Ferrara had more than 450 employees and annual revenue of approximately $140 million[74]with a portfolio holding custom chassis pumpers, aerials, and industrial apparatus. At the time, prior to the purchase, Ferrara had been E-ONE's direct competitor in the southern United States.[75]

60.     Dan Peters, then President[76] of the fire division within REV Group, known as the REV Fire Group, noted that Ferrara "has a long history of product innovation built around a commitment to heavy duty vehicle construction"[77] and the addition of this company to the REV Fire Group "enables a number of new growth opportunities including expansion of our reach

---

[71] *Supra,* Note 70.

[72] REV Group Acquires Ferrara Fire Apparatus, Inc., FIREAPPARATUSMAGAZINE.COM (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/ (last visited on June 5, 2026).

[73] *Supra*, note 46.

[74] Chris Mc Loone, REB Group Invests in the Strength of Fire Apparatus Brands, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fireapparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/REVGroupAcquiresFerraraFireApparatus,Inc. REVGROUP.COM (Apr. 25, 2017), https://investors.revgroup.com/investor-releases/2017/04-25-2017-182251523).(Last visited June 5, 2026)

[75] *Id.*

[76] Fire Engineering. Fire Industry Veteran Dan Peters Appointed CEO of Emergency Response Technologies (June 10, 22), https://www.fireengineering.com/firefighting-equipment/dan-peters-named-ceo-emergency-response-technology/#:~:text=ERT%20announced%20today%20that%20it,known%20in%20the%20firefighting%20industry(last visited June 5, 2026). ‗

[77] Supra , Note 73

nationwide and adding new geographical regions and key accounts…"[78] On the other hand, Timothy Sullivan, REV Group's then[79] President and CEO (from August 2014 to March 2020[80]), confirmed that "Ferrara will immediately contribute strategic value by expanding the REV Fire Group national footprint, dealer sales network, service and after-market parts revenue as well as enhancing our robust line of custom chassis and aerial products for multiple market segments."[81]

61.     Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively known as "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower") had a significant presence in the Midwest market.[82]  These acquisitions strengthened REV Group's position as the top fire truck manufacturer in the United States.[83]



***Picture 5: Logos of fire apparatus brands consolidated by REV Group by 2020.***

---

[78] *Id.*

[79] Id/

[80] REV Group makes another acquisition Molly Dill (Apr 26, 2017) https://biztimes.com/rev-group-makes-another-acquisition/ ( last visited June 5, 2026)

[81] *Id.*

[82] *Supra,* Note 46

[83]    Rev    Group,    Inc.    Completes    Acquisition    of    Spartan    Emergency    Response, FIREAPPARATUSMAGAZINE.COM (Feb. 3, 2020), https://www.fireapparatusmagazine.com/the-fire- station/the-station-news/rev-group-inc-completes-acquisition-of-spartan-emergency-response/) (last visited on June 5, 2026)

62.     For many years, REV Group pursued a strategy of market consolidation in the industry in which it operates, a strategy that has positioned it as a one of the top industry leaders and the "first, second or third market share positions."[84]



***Picture 6: REV Group, Inc History Consolidation Chart[85]***

63.     In 2021, REV Group abandoned the pretense of supporting independence. A REV Group investor presentation referred to REV Group as "an industry consolidator."[86] That same presentation highlighted a strategy that called for REV Group's subsidiaries to "[c]onverge on common designs that can be shared across brands,"[87] and to use Spartan's Metro Star chassis/cab as the "platform" for their offerings.[88] REV Group also ensures its larger fire department customers deal directly with corporate-level staff rather than individual brand representatives.[89]

---

[84]     REV Group, Inc., Form 10-K (October 31, 2022), at page 11 https://www.sec.gov/Archives/edgar/data/1687221/000095017022026493/revg-20221031.htm (Last visited June 5, 2026)

[85]     REV Group, Inc. Presentation, REV GROUP at 5 (July 2021)https://www.sec.gov/Archives/edgar/data/1687221/000119312521117088/d152365dex991.htm#:~:text=Today%27s%20key%20themes%20Leadership%20in,3%20market%20position%20BUS%20SPECIALTY(last visited on June 5, 2025)

[86]*Id.*

[87] *Supra,* at 46

[88] *Id.*

[89] *Supra*, at 84

The investor presentation further called for the elimination of geographic overlaps between the marketing of its different fire-truck brands and dealers. REV Group's fire apparatus operations are now "center-led," with REV Group dictating and managing the execution of "margin improvement actions" across its subsidiaries.[90]

64.     REV Group explained to shareholders that its goal was to double the fire apparatus companies' profitability. Then Timothy Sullivan, REV Group's CEO, told analysts that the companies REV Group had profit margins of 4 to 5 percent, and that REV Group was on a path "to get all of them above that 10 percent level."[91]  Sullivan further explained: "You bring them into the fold, you got to give them the religion, and they've got it now."[92]

65.     REV's Annual 10 K-Form Report 2023 with SEC states the company has a "North American dealer network comprised of 86 dealers in the United States and Canada."[93]  Globally, "there are 30 international dealers"[94]. Its dealers "hold a strong position in their assigned territories, providing them with a significant competitive advantage"[95]. Their brands in the fire segment participate in "Government Service Agency ("GSA") Schedules Program and Defense Logistics Agency ("DLA"), and they forecast to expand "distribution network into new markets."[96]

---

[90] Musharbash, supra note 26

[91] *Supra,* at Note 46.

[92] Mike Baker, Senators Investigate Private Equity Role in Soaring Fire-Truck Costs, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited June 5, 2026)

[93] REV Group, Inc., Form 10-K (2023), U.S. Securities 7 Exchange Commission (October 31, 2023),at https://companiesmarketcap.com/inr/rev-group/sec-reports-10k/0000950170-23-069876/ (last visited June 5, 2026)

[94] *Id.*

[95] *Id.*

[96] *Id.*

66.     Their products "are sold to municipalities, government agencies, private contractors, consumers, and industrial and commercial end users".[97]  They have a diverse customer base with their "top 10 customers representing approximately 21% of their net sales in the fiscal year 2024, with no single customer representing more than 5% of our net sales over the same period."[98]  They believe their "diverse end markets are favorably exposed to multiple secular growth drives such as: municipal spending, overall population growth, a growing aged population, increasing popularity of outdoor and active lifestyles, technological advances, and the replacement of existing service vehicles including legislative replacements".[99]

67.     According to their 2023 10-K filing Annual Report , their business model involves seeking:

> Our business model utilizes our scale to drive profitable organic and acquisitive growth. We seek to gain market share by delivering high-quality products with customized attributes tailored to our customers' product specifications, while simultaneously reducing costs and managing delivery lead times. We aim to achieve this by standardizing and optimizing certain processes across our segments via our proprietary REV Drive Business System and in areas including: procurement, engineering and product development and lean manufacturing. We believe our manufacturing and service network, consisting of 17 primary manufacturing facilities, 3 Regional Technical Centers ("RTCs") and 3 aftermarket parts warehouses, provides us with a competitive advantage through the sharing of best practices, manufacturing flexibility based on relative facility utilization levels, access to geographically diverse labor pools, lower delivery costs, economies of scale, customer service capabilities, and a complementary distribution system. Our business consists primarily of design, engineering, technology application, integration, and assembly activities, which require relatively low levels of maintenance capital expenditures. Furthermore, our broad presence across the specialty vehicle market and large manufacturing and distribution network are important differentiators in our potential to grow through acquisitions. We believe we have the opportunity to grow and enhance the earnings profile of acquired businesses by expanding access to sales distribution channels, consolidating acquired businesses into our existing operations, and by introducing the REV Drive Business System and scale into newly acquired businesses to drive profitable growth.

*Picture 7: Annual REV Group 10k Form extract[100]*

68.     However, the very people Rev Group purports to serve are compelled to pay artificially inflated prices for fire trucks while enduring delays that stretch from days, months to years, delays that directly jeopardize emergency readiness and the safety of the public.

### 2. Oshkosh Corporation ("Oshkosh") and Pierce Manufacturing Inc. ("Pierce")

---

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] *Id.*

69.     Since the 1910's Oshkosh, then called Oshkosh Truck Corporation[101],   has been in the industry manufacturing trucks, vehicles for the military , delivering in the 1950's the first Aircraft Rescue and Firefighting ("ARFF") vehicle for the US Coast Guard for more than a decade.[102]   In 1996, Oshkosh acquired Pierce Manufacturing Inc, a major industry supplier in commercial and highly customized firefighting apparatus and vehicles since 1913.[103]



*Picture 8: Oshkosh and Pierce Manufacturing, Inc. Logo*

70.     Oshkosh followed REV Groups' footsteps in acquiring marketing and competitive power in the industry and purchased more companies such as: JLG, JerrDan LLC, McNeilus, Hinowa, AUSACORP S.L., Oshkosh Aerotech, McNeilus companies, Inc, Maxi Metal, Pratt & Miller and others.[104]

71.     Currently, Maxi-Metal and Pierce "design and manufacture commercial and customer fire apparatus vehicles primarily for fire departments, airports, and other governmental units."[105]

---

[101] Oshkosh. Our History, https://www.oshkoshcorp.com/story/history (last visited June 5, 2026).

[102] *Id*.

[103] *Id.*

[104] Oshkosh Corporation Form 10-K (2024), U.S. Securities 7 Exchange Commission (December 31, 2024), https://www.sec.gov/Archives/edgar/data/775158/000095017025024305/osk-20241231.htm (last visited June 5, 2026)

[105] *Id.*

72.     In 2021, Oshkosh's primary North American subsidiary, Pierce, announced that it had acquired Boise Mobile Equipment ("BME").[106]   Currently, it owns a 25% interest in BME Fire Trucks LLC (Idaho).[107] BME's product portfolio, which allowed Pierce to expand its reach and focus to West Coast markets, included fire apparatus like the Model 34, Tactical Tender, and Type 6 Xtreme.[108] In 2022, Oshkosh acquired Maxi-Metal, Inc.,[109] a leading designer and manufacturer of custom fire trucks. After these expansions, Oshkosh controlled a full quarter of the U.S. fire truck market.

73.     In addition to purchasing third-party manufacturers, Oshkosh also embarked on a strategy of consolidating the U.S. brands already within its purview, reducing geographic overlap between its dealers. In July 2018, Pierce subsidiary, MacQueen Emergency Group ("MacQueen") acquired Schuhmacher Fire Equipment. The acquisition consolidated MacQueen's control over the upper Midwest, including Minnesota, Nebraska, South Dakota, North Dakota, and 109 Missouri counties.[110]

---

[106]     Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment, OSHKOSHCORP.COM (Sept. 16, 2021), https://www.piercemfg.com/pierce/press-release/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment (last visited June 5, 2026)

[107]     Oshkosh Corporation, Form 10-K (December 31, 2022), EX-21 https://www.sec.gov/ix?doc=/Archives/edgar/data/775158/000095017023003473/osk-20221231.htm; https://www.sec.gov/Archives/edgar/data/775158/000095017023003473/osk-ex21.htm (last visited June 5, 2026)

[108]     Pierce Completes Ownership Interest in BME, FIREHOUSE.COM (Sept. 16, 2021), https://www.firehouse.com/apparatus/press-release/21238596/pierce-manufacturing-custom-firetruck-builder-pumpers-ladders-quints-rescues-puc-enforcer-pierce-completes-ownership-interestin-bme     PIERCEMFG.COM (Sept. 16, 2021), https://www.piercemfg.com/pierce/press-release/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment (last visited June 5, 2026)

[109]     4 Oshkosh Corporation Acquires Maxi-Metal, Inc., OSHKOSHCORP.COM (Jun. 13, 2022), https://www.oshkoshcorp.com/news/2022/6-13-22-maxi-metal (last visited June 5, 2026)

[110]     MacQueen Emergency Group Territory Expanded to Include 109 Missouri Counties, PIERCEMFG.COM (July 10, 2018), https://www.piercemfg.com/pierce/press-release/macqueen-emergency-group-territory-expanded-to-include-109-missouri-counties (last visited June 5, 2026)

25

74.     In January 2019, Pierce dealer Siddons-Martin Emergency Group ("Siddons") acquired Superior Equipment, consolidating control over the American Southwest.[111] Siddons' territory now includes Texas, Louisiana, New Mexico, Utah, and Nevada.

75.     In November 2019, Pierce dealer Allegiance Fire and Rescue ("Allegiance") acquired Minuteman Fire and Rescue. The acquisition expanded Allegiance's territory to encompass most of New England, including Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.[112]

76.     In September 2023, Pierce dealer Firematic Supply Co. Inc. ("Firematic") acquired Churchville Fire Equipment. The acquisition consolidated Firematic's control over Connecticut and New York.[113]

77.     In November 2023, Oshkosh and Pierce came together for a "five-year supply contract with Mississauga Fire and Emergency Services ("MFES") in Ontario, Canada.[114]

78.     Most recently, on June 12, 2025, Pierce dealer Reliant Fire Apparatus brand ("Reliant") acquired Halt Fire, Inc., thereby consolidating Reliant's "exclusive Pierce territory" to

---

[111] Siddons-Martin Emergency Group Expands Territory with Acquisition of Superior Equipment, PIERCEMFG.COM (Jan. 21, 2020), https://www.piercemfg.com/pierce/press-release/siddons-martin-emergency-group-expands-territory-with-acquisition-of-superior-equipment (last visited June 5, 2026)

[112] Minuteman Fire and Rescue Acquire by Allegiance Fire and Rescue, (Nov. 18, 2019), https://www.piercemfg.com/pierce/press-release/minuteman-fire-and-rescue-acquired-by-allegiance-fire-and-rescue (last visited June 5, 2026)

[113] Pierce Dealer Firematic Supply Co. Grows Presence in Northeast with Acquisition of Churchville Fire Equipment, PIERCEMFG.COM (Sept. 1, 2023), https://www.piercemfg.com/pierce/press-release/pierce-dealer-firematic-supply-co.-grows-presence-in-northeast-with-acquisition-of-churchville-fire-equipment (June 5, 2026)

[114] Fire Services in the City, Missisauga, https://www.mississauga.ca/services-and-programs/health-and-safety/fire-and-emergency-services/fire-services-in-the-city/ (last visited on June 5, 2026)

include Michigan, in addition to its existing territories in Wisconsin and Iowa.[115] Pierce noted that Reliant would "align Michigan operations with its existing territories" to "ensur[e] a consistent and reliable customer experience."[116]

79.     These consolidations, which have largely eliminated geographic overlaps and given Pierce dealers exclusive control across vast territories, have reduced or eliminated competition among Pierce subsidiaries.

### 3.  Rosenabuer International AG ("Rosenbauer")

80.     The Rosenbauer Group, is an Austrian based leading manufacturing global company that has been in the fire truck industry for over more than 150 years.[117]   It's parent company "Rosenbauer International AG"   is the main entity of broader Rosenbauer Group, which "develops and produces vehicles, firefighting and safety equipment, and digital solutions for professional, in-house, plant and voluntary fire departments, as well as systems for preventive fire protection."[118]

81.     By the late 20th century, Rosenbauer Group started entering the US market looking to expand its global manufacturing power and after acquiring several companies, and mergers with

---

[115] Reliant Fire Apparatus Acquires Halt Fire, Inc. Expands Pierce Dealership Territory to Include the State of Michigan, PIERCEMFG.COM (Jun 12, 2025), https://www.fireapparatusmagazine.com/industry-news/reliant-fire-apparatus-acquires-halt-fire/(last visited June 5, 2026)

[116] *Id.*

[117] Rosenbauer, Fighting American Fires Since 1995., https://www.austria.org/business/rosenbauer (last visited June 5, 2026)

[118] Rosenbauer, Company Profile  https://www.rosenbauer.com/en/company/about-rosenbauer/company-profile#:~:text=Group%20profile%20-%20Rosenbauer,for%20the%20future%20of%20firefighting (last visited June 5, 2026)

Rosenbauer International and Rosenbauer Minnesota, Rosenbauer America LLC ("Rosenbauer America") was born.[119]

82.     By 2022, Rosenbauer International AG increased its stakes from 50 percent to 75 percent by buying 25 percent minority share of Rosenbauer America LLC, securing control over the company.[120] Rosenbauer America had a business volume that amounted to € 262.9 million ($276.5 million USD in 2022)[121].

83.     Rosenbauer America is currently the "second largest fire truck manufacturer in North America"[122] investing in "additional technology, innovation, and brand awareness as means to further focus on sustainability and safety".[123]

84.     Rosenbauer Group is currently a dominant player with product fabrication in "Europe, the US and Asia with sales of €1 305.9 million ($1,531,811,400 USD), around 4,500 employees (as of December 31, 2024) and sales and service network in approximately 110 countries"[124] making it the "largest supplier of fire equipment in the world."[125]

---

[119] Ian, Rosenabuer America (September 15, 2021), https://manufacturing-today.com/news/rosenbauer-america/#:~:text=Seeing%20red,wouldn%20t%%20have%20had%20previously (last visited June 5, 2026)

[120] Rosenbauer, Rosenbauer International increases stakes in Rosenbauer America (April 29, 2022)., https://www.rosenbauer.com/en/company/investor-relations/financial-news/2022/04/rosenbauer-international-increases-stakes-in-rosenbauer-america (last visited June 5, 2026)

[121] *Id*.

[122] *Supra*, Note 125.

[123] *Id.*

[124] *Id.*

[125] *Id.*

85.      Rosenbauer Group' dealers are authorized distributors selling and servicing their world-leading fire-apparatus, with US dealers including, but not limited to, Gabrielli Trucks[126] (New York/Tri-State), Defender Emergency Products[127] (New Jersey), FRESCO Emergency Sales[128] (United States), All American Fire Equipment[129] (Ohio, West Virginia, Kentucky and Pennsylvania), and Heiman Fire[130] (Midwest). In 2023, Rosenbauer America partnered with IKON Fire, LLC, making them the new dealer for Rosenbauer apparatus in Colorado and Wyoming.[131]



*Picture 9: Geographic Territories of Rosenbauer dealers*

[126] Gabrielli Trucks, Gabrielli Trucks: Your Certified Rosenbauer Fire Truck Dealer in the Tri-State Area, https://www.gabriellitruck.com/learn-more--rosenbauer-fire-trucks#:~:text=Gabrielli%20Trucks:%20Your%20Certified%20Rosenbauer,Rosenbauer%20or%20any%20other%20brand. ( last visited June 5, 2026)

[127] Defender Emergency Products Sales & Services. https://defenderemergency.com/ (last visited on June 5, 2026)

[128] Rosenbauer, Rosenbauer International is the world's leader in firefighting innovation since 1866.https://fescosales.com/rosenbauer/ (last visited June 5, 2026)

[129] All American Fire Equipment. https://allamericanfire.us/ (last visited June 5, 2026)

[130] Heiman Fire Equipment, Upper Midwest Rosenbauer Dealer, https://heimanfiretrucks.com/rosenbauer (last visited June 5, 2026)

[131] Rosenbauer Announces New Partnership with IKON Fire , LLC in CO and WY US Fire Apparatus (March 27, 2023) https://www.fireapparatusmagazine.com/fire-apparatus/rosenbauer-announces-new-partnership-with-ikon-fire-llc-in-co-and-wy (last visited June 5, 2026)

86.     Like previous fire apparatus manufacturers, dealers operate in distinct territories, eliminating overlap and limiting competition between them.

## C. Manufacturer Defendants collude to Suppress Competition

87.     While acquiring and consolidating independent fire truck manufacturers and limiting competition among their own brands, the Manufacturer Defendants have also colluded to suppress competition among themselves. Such as, REV Group's then Vice President and now President[132] of Sales in the Fire Group, Mike Virnig, stated: "What I won't tolerate is negative selling. I won't tolerate it with our competitors, and I won't tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say, 'Stop it.'"[133] However, in contradiction he states REV Fire Group are to "leave the brands alone and let them be successful on their own, competing in the marketplace that we compete in today".[134] But, dealers had expressed fear about being closed or consolidated.[135]   In regards to it , Virnig states "I tell them that makes no sense." And "We just paid a lot of money for a company, and you are a dealer for that company. Why would we want to shrink the sales of that company by closing dealership?"[136]

---

[132] Mr. Mike Virnig, Testimony of Mr. Mike Viring President, Rev Specialty Vehicles Group Subcommittee on Disaster Management, District of Columbia & Census (September 10, 2025). https://www.hsgac.senate.gov/wp-content/uploads/Virnig-Testimony.pdf   (last visited June 5, 2026)

[133] Chris Mc Loone, REB Group Invests in the Strength of Fire Apparatus Brands, FIREAPPARATUSMAGAZINE.COM   (July   1,   2020),   https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands (emphasis added) (last visited June 5, 2026)

[134] *Id*.

[135] *Id.*

[136] *Id.*

88. Executives at the REV Group company have also informed analysts that the company planned to substantially increase its profit margins, nothing that other companies were pursuing similar strategies.[137]

89. Several years later, in 2020, John Pfeifer, Oshkosh's President and COO [138], explained "[O]n the pricing front, we've maintained a positive price/cost equation for the year. We're very careful and very disciplined in how we manage our pricing. We are the market leader, and we'll stay disciplined."[139]

**D. Manufacturer Defendants exchange confidential, competitively sensitive information through FAMA**

90. FAMA known as the Fire Apparatus Manufacturers' Association, began as a small group of manufacturers and since the late 1940's, it has grown to include "hundreds of representatives from over 125 member companies throughout North America."[140] As of June 2025, FAMA membership "has grown to approximately 135 companies, currently including 55 manufacturers of fire apparatus and associated emergency response vehicles."[141] All the members "produce apparatus or components for fire apparatus for domestic and export markets at facilities in the United States and Canada."[142]

---

[137] Supra, at Note 92

[138] Oshkosh, Leading with purpose, Grounded in values. https://www.oshkoshcorp.com/story/leadership (last visited June 5, 2026)

[139] Oshkosh Corp., Q4 Earnings Call Transcript (Oct. 29, 2020), https://seekingalpha.com/article/4382859-oshkosh-corp-osk-ceo-wilson-jones-on-q4-2020-results-earnings-call-transcript (last visited June 5, 2026)

[140] *Supra*, at 140

[141] FAMA, Fama Releases Fire Apparatus Industry Update (June 17, 2025), https://www.fama.org/fama-releases-fire-apparatus-industry-update/ (last visited June 5, 2026)

[142] *Id.*

91.     In order to be a member of FAMA, companies need to be qualified and eligible by complying with the following eligibility requisites such as:

"(a) those otherwise qualified individuals , partnerships, and corporations engaged in the manufacture of firefighting or fire protection apparatus, including rescue vehicles that could complement said apparatus"[143] and "(b) those otherwise qualified individuals, partnerships, and corporations that manufacture components or products which are incorporated by the manufacturer as a permanent part of the completed apparatus, or products specifically designed for fire service applications that are affixed to, or carried upon, , the fire apparatus for use in conjunction with the fire apparatus in performing its firefighting function, such as chassis, fire pumps, fire hoses, hose reels, ladder, aerial devices, apparatus valves, and other water appliances, provide that the prospective member engages in manufacturing in North America."[144]



*Picture 10: Top 10 Reasons to Join Fama[145]*

---

[143] FAMA, Why Join? https://www.fama.org/why-join ( last visited June 5, 2026)

[144] *Id.*

[145] *Id.*

92.     Notably, under these requirements fire departments, municipalities, and other fire apparatus purchases cannot join FAMA.  Consequently, these entities, who are manufacturers' customers, are excluded from the data manufacturers share with one another.

93.     Furthermore, there are qualifications requirements such as: qualified business entities that, during the preceding 12 month period , using its own employees at its own facilities located in the US or Canada, has manufactured for commercial resale of the firefighting or fire protection apparatus, including rescue vehicles and command vehicles intended to dure in emergency services; components or products which are later incorporated by the fire apparatus manufacturer as a permanent part of the completed fire apparatus; or products specifically designed for fire service application that are affixed to, or carried upon, the fire apparatus for use in conjunction with the fire apparatus in performing its firefighting ,rescue or command function.."[146] If that is enough, companies need to submit a formal online application.[147]

94.     Additionally, to view the membership list, FAMA, a not-for-profit trade association who's "overall goal is to improve business conditions and to advance and protect the interest of the fire and emergency services industry"[148], requires the public to login. This is also the case to

---

[146] FAMA, How to Join. Qualifications For Membership. https://www.fama.org/how-to-join (last visited June 5, 2026)

[147] FAMA, Membership Application, Online Application, https://www.fama.org/membership/application/ (last visited June 5, 2026)

[148]     Fire     Apparatus     Manufacturers     Association     Our     History https://www.fama.org/history/#:~:text=From%20the%20small%20group%20of,needs%20of%20the%20fire%20service. (last visited June 5, 2026)

view "Member Area"[149] and "Basecamp"[150], which consequently is hidden to the general public and/or non-members.





*Picture 11: Members List Log In Web Page[151]*

95.     E-One, Ferrara, KME, Spartan, Pierce, and Rosenbauer, which together represent all three Manufacturer Defendants, are members of FAMA.[152]   FAMA works with the Manufacturer Defendants to enable the exchange of competitively sensitive information via statistical reports and semiannual meetings.

### 1.  FAMA Membership

96.     Once eligible to be a member of FAMA, members meet "twice a year to promote advancement of technology and safety in firefighting equipment."[153] These meetings are held during the spring and fall.[154]

97.     In regard to the meetings and membership, FAMA states it is:

---

[149] FAMA, You Must Be Logged In To View This Page. https://www.fama.org/members/area/ (last visited June 5, 2026)

[150] *Id.*

[151] *Id.*

[152] Members List, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/members/list (last visited June 5, 2026)

[153] *Id.*

[154] *Id.*

"Unique in that members honestly share information and are willing to only discuss common issues to determine what can be accomplished, collectively, that best meet the needs of the fire service. This type of communication has allowed manufacturers and end users alike to enjoy the benefits of highly improved, more efficient, and safer equipment."[155]

98. At these meetings, attendees, including direct competitors, listen to presentations that include economic forecasts regarding the fire truck manufacturing market. These meetings are held some years in physical places and others virtually.[156]

99. From these meetings, minutes are taken recording subjects that have been discussed between the members and the committees, such as in the General Membership Meeting Marriott Coronado Resort & Spa in Coronado, California- February 23-24, 2018, and none of these discussions mention the fire apparatus crisis surrounding the communities and no provided solution.[157]

100. These meetings are also being sponsored by members, like the Manufacturer Defendants since 2016. Such as Rosenbauer and REV Group sponsored in the 2016 and 2019[158]

---

[155] *Id.*

[156] FAMA, 2024 FAMA Virtual Fall Membership Meeting, https://www.fama.org/event/2024-fama-virtual-fall-membership-meeting/ (last visited June 5, 2026)

[157] FAMA, Minutes: Fire Apparatus Manufacturers' Association General Membership Meeting Marriott Coronado Resort & Spa in Coronado, CA February 23-24, 2018 ( October 4-5, 2017) https://www.fama.org/wp-content/uploads/2021/03/1617209883_6064aa1bc1f0d.pdf#:~:text=Next%20Meeting%20Notice%20%E2%80%93%20The%20next%20meeting,Island%20Resort%20and%20Spa%2C%20in%20Coronado%2C%20CA (last visited June 5, 2026)

[158] FAMA, 2019 FAMA Spring Meeting Committee Reports Presentation (2019), https://www.fama.org/wp-content/uploads/2019/03/1552404694_5c87d0d629f2a.pdf (last visited June 5, 2026)

FAMA Spring meeting presentation[159]; RevGroup in 2017[160]; Rev Group-E-One, REV Group-KME, REV Group-Ferrara, and Rosenbauer in 2019[161] and Ferrara, Spartan, KME and E-One are platinum sponsors for the 2022 FAMA Spring Meeting.[162]

101.    Attendees also engage in "purchasing roundtables" and FAMA members-only meetings and discussion groups.

102.    It offers added benefits for those who want to join the association such as members acquiring the benefit of receiving "statistical reports provided quarterly and encapsulated for every year-end." FAMA further established that "only those companies that participate in the statistical studies and members are privy". [163]

**MEETING REGISTRATION FEES AND ASSOCIATION POLICIES**

- Employees of member companies: **$425 per person**
- Each employee must complete a separate registration form
- Guests (non-employee) / Spouses- **$200 per person** (Employees of member companies are not eligible for the reduced Spouse/Guest Fee.)
- Children 11 years or more – **$200 per person**
- Children 3-10 – **$100 per person**
- Children under 3 – no charge
- The Association does not offer an "a la carte" meeting fee schedule.

ASSOCIATION MEETING REGISTRATION AND ATTENDEE POLICIES –

- FAMA Member Representatives are defined as full-time, direct-paid, active employees of FAMA member companies in good standing.
- Attendance at membership meetings is limited to FAMA Member Representatives and their spouses or guests. Consultants of member companies are not permitted.
- All member representatives and guests attending or participating in any of the event functions are required by the Association policies to be registered.
- Attendee badges are required at all event functions.
- Member companies must be current and in good standing for representatives to attend.
- Members are reminded that FAMA policies prohibit direct selling during meeting events and in common areas of the hotel where members socialize and network.

*Picture 12: FAMA 2025 Spring Meeting Registration*

---

[159] FAMA, 2016 FAMA Spring Meeting (2016) https://www.fama.org/fama-tumbnail-ad-3/ (last visited June 5, 2026).

[160] FAMA, 2017 FAMA Spring Meeting, (2017) https://www.fama.org/wp-content/uploads/2019/03/1552404694_5c87d0d629f2a.pdf (last visited June 5, 2026)

[161] *Supra*, 165

[162] FAMA, 2022 Spring Meeting (2022) https://www.fama.org/wp-content/uploads/2022/05/1652114189_6279430d1ab2e.pdf (last visited June 5, 2026)

[163] *Supra*, 149

### 2. FAMA Statistical Reports and Survey Reports

103.　FAMA describes access to competitor's data as "one of the most valuable ones"[164] for companies to join the organization.　Additionally, this detailed data "is reserved exclusively to our members..."[165] Meaning it is kept confidential among the Manufacturer Defendants and FAMA.



***Picture 13: Stats FAMA Log In Reports and/or Manage Company Data[166]***

104.　FAMA currently has 11 committees. FAMA currently has 11 committees.　Out of this 11 committees, three are the most active (1) The Governmental Affairs Committee (GAC) which works strategic partners in the fire service to advocate for effective funding and legislation at the state and federal laws, which has assisted FAMA for over 20 years in "establishing and enhancing the Assistance to Firefighter Grants (AFG) and Staffing for Adequate Fire and

---

[164] Paul C. Darley, The Fire Apparatus Market Is Coming Back…Just Look At the Data (December 4, 2015) https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/#:~:text=The%20Fire%20Apparatus%20Manufacturers%27%20Association,why%20they%20join%20our%20association.(last visited June 5, 2026)

[165] *Id*.

[166] FAMA, Reports Log In Page, https://stats.fama.org (last visited June 5, 2026)

Emergency Response (SAFER) programs"[167]; (2) the Data and Research Committee (the "Committee") which "overse[es] collection and presentation of the most comprehensive data set in the industry."[168] And (3) the Technical Committee.[169]

105.    The Committee's mission is to "help strengthen FAMA member companies by providing actionable data for strategic business planning."[170] This includes "economic data, fire market trends, and apparatus sales and order statistics."[171] Their objective is to "collect and distribute data regarding apparatus sales and orders on a quarterly basis"[172] and " gather data from various sources that is helpful in business planning by member companies."[173]

106.    The Data & Research Committee maintains a digital data in which "US and Canadian apparatus manufacturers enter order and delivery statistics on fire apparatus."[174]  They collect data on a "yearly basis."[175] All of this data is "not visible to any member or employee of FAMA." [176] This data is then "forwarded electronically to a Board-approved, independent accounting firm."[177] It should be noted, FAMA members , including Manufacturer Defendants,

---

[167] Supra, Note 147

[168] *Id.*

[169] *Id.*

[170] FAMA, Data & Research Committee. https:///www.fama.org/data-research-committee/(last visited June 5, 2026)

[171] *Id.*

[172] *Id.*

[173] *Id.*

[174] *Id.*

[175] *Id.*

[176] *Id.*

[177] *Id*.

can be part of the committee or any other committee.[178] In 2020, Jaromie Johnston, who is currently the Vice President of Segment Strategy and Business Development of Pierce Manufacturing Co. was the Secretary Education-Scholarship & Surveys & Statistics of the FAMA Board of Directors and Bert McCutcheon, and then Vice President and General Manager[179] at Ferrara (2017-2022) and Vice President of Product Management[180] from January 2022-November 2022, was the Director at Large of the Technical Committee[181] and then President of FAMA in 2023. Currently in 2025, Paul Bostrom from H.O Bostrom & Company, Inc. is the Chairman and John Schultz, the Vice Chairman of the Committee and the Vice President and General Manager of Pumper Products[182] of Pumper Products for Pierce Manufacturing, Inc.[183]

107. As part of their policies and procedures, the Committee "maintains a digital portal in which the data collected is not "visible to any member"[184] This included "no individual participant's name or statistics submitted"[185] is "disclosed by FAMA or an independent firm."[186]

---

[178] *Id.*

[179] REV Fire Group Announces Darin Moorde as VP/GM of Ferrara Bert Mccutcheon Appointed to VP Of Product Management (Jan 4, 2022). https://revgroup.com/rev-fire-group-announces-darin-moore-as-vp-gm-of-ferrara-bert-mccutcheon-appointed-to-vp-of-product-management/ (Last visited June 5, 2026).

[180] FFEMSA, Focused on Service the Fire Service News Spring 2022,at pg. 27. https://www.fama.org/wp-content/uploads/2022/05/1652114189_6279430d1ab2e.pdf (Last visited June 5, 2026)

[181] FAMA, 2020 Fall Meeting Presentation (2020), https://www.fama.org/wp-content/uploads/2020/10/1603308041_5f908a09e44fe.pdf (Last visited June 5, 2026)

[182] Pierce, John Schultz VP & General Manager- Pumper Products , https://www.piercemfg.com/hubfs/FDIC%202025/Bios/Bio/John%20Schultz%20-%20Pierce%20Manufacturing.pdf (Last visited June 5, 2026)

[183] *Supra*, at 164

[184] *Id.*

[185] *Id.*

[186] *Id.*

Data collected is supposed to be from "past transactions or activities."[187] After the data is collected " it should be compiled in composite form so as to conceal the identity of any company or of any specific transaction."[188] That data is sent to an accounting firm, which compiles the data and returns it to the Data & Research Committee.[189] The Committee then uploads the data onto the FAMA website.[190]

108. The Committee is supposed to adhere to their own establish guidelines for preparing, conducting and promulgating statistical programs, including publishing "the data by the end of the month following the close of each calendar quarter; programs to be undertaken in strict compliance with the letter and spirit of any applicable federal antitrust laws and trade regulation laws; and programs to provide information to FAMA members to assist them in making business decisions.[191]

109. Not just anyone can access this data, however. "FAMA does not release this information to the public."[192] Instead, the data is uploaded onto a secure portion of the FAMA

---

[187] *Id.*

[188] *Id.*

[189] *Id.*

[190] *Id.*

[191] *Id.*

[192] *Id.*

website that FAMA describes as a "members-only section." [193] "Only those companies that participate in the statistical studies and members are privy to these reports."[194]

110.    As part of their FAMA spring meetings, it provides a training for members on the application of FAMA statistics data by (1) accessing the portal; (2) clicking FAMA statistics; (3)demonstrating ways to search data (for example data range) and data graphs and maps per state or providence; (4) showing market share, market trends, industry backlogs, and sales forecasting; and others.



*Picture 14: 2022 Spring Meeting Presentation Training[195]*

---

[193]    FIRE APPARATUS MFRS. ASS'N, WHY JOIN FAMA, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (Last visited June 5, 2026)

[194]    The Fire Apparatus Market is coming back… Just Look at the Data ( December 4, 2015) , https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/(Last visited June 5, 2026)

[195]    FAMA, 2022 Spring Meeting Presentation (2022), https://www.fama.org/wp-content/uploads/2022/03/1646772096_6227bf80d4238.pdf  (Last visited June 5, 2026)





*Picture 15: 2022 Spring Meeting Presentation Training: Login[196]*




*Picture 16: 2022 Spring Meeting Presentation Training: Interactive[197]*

---

[196] *Id.*

[197] *Id.*



*Picture 17: 2022 Spring Meeting Presentation Training Interactive*[198]



*Picture 18: 2022 Spring Meeting Presentation Training: Raw Data*[199]

---

[198] *Id.*

[199] *Id.*







*Picture 19: 2022 Spring Meeting Presentation Training: OEM Market Share[200]*



*Picture 20: 2022 Spring Meeting Presentation Training: Component Forecasting[201]*

---

[200] *Id.*

[201] *Id.*





*Picture 21: 2022 Spring Meeting Presentation Training: Component Forecasting*[202]



*Picture 22: 2022 Spring Meeting Presentation Training: Component Forecasting*[203]

---

[202]  *Id.*

[203]  *Id.*

45





*Picture 23: 2022 Spring Meeting Presentation Training: Component Forecasting[204]*

111.    As previously mentioned, FAMA imposes strict limits on who can become a member,   and consequently, who has access to these reports.[205]

112.    FAMA further restricts data access to participating members that supply their own data, creating a reciprocal "give data to receive data" arrangement. Statistical information and reports to any company may be denied to "any company and individual that that does not agree in advance of participation to keep the results confidential."[206]

---

[204] *Id.*

[205] *Supra*, Note 196

[206] *Id.*

46



**INDUSTRY STATISTICS**

FAMA is the ONLY source for accurate fire service statistics provided quarterly and summarized at year end. Only FAMA members are privy to these reports since they are not released to the public. Members find this research invaluable for their internal business purposes regarding apparatus purchases by state, product category, pump type and more.

*Picture 24: Section of a flyer titled "Why Join FAMA?*

**FAMA statistics _and_ reports are CONFIDENTIAL and are available only to member companies. FAMA data shall not be distributed, repurposed or exchanged with any non-member parties.**

*Picture 25: Confidential Warning on FAMA letter[207]*

113. Furthermore, FAMA "communicated with its members on a regular basis via emails, its website and an extensive FAMA newsletter."[208] These communications provided an additional channel for coordination among the Manufacturer Defendants.

114. Manufacturer Defendants and FAMA have operated within the same industry and in close coordination for many years. During FAMA's biannual meetings, where fire apparatus industry data was gathered, reviewed, and subsequently published on the FAMA members-only portal, Manufacturer Defendants had repeated and extended opportunities to exchange competitively sensitive economic information.

---

[207] FAMA,Paul Bostrom, Mike Moore, and Mike Schoenberger, The 1st Quarter 2017 FAMA Statistics have been confirmed and are ready for analysis, (May 11, 2017) https://www.fama.org/wp-content/uploads/2017/05/1494518464_59148ac0cc41b.pdf. (last visited June 5, 2026)

[208] *Id.*

47

115. Moreover, employees of several manufacturer Defendants occupied influential positions on the FAMA's Board and served on multiple FAMA committees. These committee and board roles carried delegated authority and provided privileged access and power to non-public industry- nation wide data.

116. As a result, Manufacturer Defendants were able to obtain information and exert influence beyond that available to other members or competitors, enabling them to use such access and exchanged information to advance their own commercial interests and secure improper competitive disadvantages leading to drive up prices and multi-year backlogs.



*Picture 26: Section of a flyer titled "Why Join Fama?"[209]*

### E. Supply Suppression and Price Inflation Resulting from Defendants' Conspiracy

#### 1. 40% Increase in Fire Apparatus Backlogs

117. Demand for fire trucks began rising in the mid-2010s as the economy recovered from the Great Recession, increasing steadily through approximately 2020.[210] From 2020 to 2022, orders surged as municipalities were bolstered by COVID-19 relief funds. Since 2022, order volumes have stabilized, generally ranging approximately between 5,500 and 6,500 units annually.[211]

---

[209] *Supra,* Note 196

[210] *Supra*, Note 72 at 6

[211] *Id.*

118. Manufacturer Defendants production has not kept pace with this increased demand. In the past few years, order backlogs have grown significantly. For example, REV Group reported a record $3.6 billion backlog in late 2023, a 41% increase over 2022.[212] REV Group's backlog increased again in December 2024.[213] As of last October, REV Group had a $4.4 billion backlog on fire and emergency vehicle orders in the United States.[214]

119. Oshkosh and Rosenbauer have likewise reported exceptionally large backlogs. Oshkosh's fire truck backlog quadrupled from 2019 to 2023, and the company recently disclosed approximately $4 billion in unfilled orders.[215] Rosenbauer similarly reported an estimated $2.67 billion backlog at the end of 2024.[216]

120. Rising backlogs have resulted in significant delays in the delivery of new fire trucks, with wait times in some regions increasing more than fourfold, from roughly 1 year to approximately 4.5 years.[217]

---

[212] Reuters, Fire Truck Boom Highlights Divide in US Manufacturing, U.S. NEWS (Jan. 19, 2024), https://www.reuters.com/markets/us/fire-truck-boom-highlights-divide-us-manufacturing-2024-01-19/(last visited June 5, 2026)

[213] REV Group, Inc. Reports trong Fiscal 2024 Fourth Quarter and Full Year Results(December 11, 2024), https://revgroup.com/rev-group-inc-reports-strong-fiscal-2024-fourth-quarter-and-full-year-results/ (last visited June 5, 2026)

[214] Rev Group, Inc. SEC Form 10K (Oct. 31, 2024), https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm

[215] Supra note 92

[216] Rosenbauer Group with a successful year 2024 and a positive outlook ( February 14, 2025_ https://www.rosenbauer.com/en/company/investor-relations/financial-news/2025/02/rosenbauer-group-with-a-successful-year-2024-and-a-positive-outlook (last visited June 5, 2026)

[217] American Economic Liberties Project and International Association of Fire Fighters, Letter to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and FTC Chair Andrew Ferguson, at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited June 5, 2026)

49

121. On top of already high base prices for new fire trucks, REV Group, Oshkosh, and Rosenbauer have relied on the significant industry backlog to justify imposing "floating prices" on their customers. Using the purported difficulty of projecting material costs over a years-long lead time as an excuse, Manufacturer Defendants have added price clauses to their contracts that allow Manufacturer Defendants to increase the final price of a fire truck after it goes into production. Due to production delays, this means Manufacturer Defendants can increase their prices years after a fire department initially orders a truck.[218] Mark Fusco, the president of Rosenbauer America, has conceded that his company imposes "surcharges that might occur during the build times" on Rosenbauer customers.[219]

122. One fire department in Massachusetts ordered a fire truck in 2022 and then added two more trucks to their original order in 2023. After the second order, the fire truck manufacturer increased the price of the truck ordered in 2022 by $150,000 to match the price of the trucks ordered in 2023. The manufacturer threatened not to deliver the truck ordered in 2022 unless the fire department agreed to the price increase. The fire chief felt "compelled to pay this increase out of fear that the process to get apparatus would take too long and we would not be able to provide service to our community."[220]

---

[218] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing, https://www.banks.senate.gov/news/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing/ (Last visited June 5, 2026)

[219] Ed Ballam, 2022 Was Good for Fire Service Industry; 2023 Is Uncertain, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 20, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain/#:~:text=The%20verdict%20is%20in%3A%20Many,and%20a%20tight%20labor%20market (Last visited June 5, 2026)

[220] *Supra*, at Note 221

123.    As another example, a fire department in Indiana was hit with a more than $100,000 price increase for the same pumper truck after a 7-month delay[221]. And in yet a third example, the Loveland Fire Rescue Authority in Colorado experienced a surcharge of $29,000 on a pending order.[222]

124.    Overall, the backlog has affected the nation. In April 2025, United States Senator's Elizabeth Warren and Jim Banks addressed a letter to International Association of Fire Fighter's Edward A. Kelly seeking information on the "impacts of private equity roll-ups of fire truck manufacturers, and the adverse impact of this consolidation on fire fighter and public safety."[223] They continue " the lack of competition in the industry has allowed private equity to hike fire truck prices, restrict fire truck production, and created a dangerous backlog of firefighting equipment."[224] As per a New York Times investigation REV Group had "permanently shut down its own manufacturers' plants- reducing REV Group's fire truck manufacturing capabilities by one-third- even though demand for fire trucks has increased in recent years" which has led to nationwide backlogs.[225]

---

[221] *Id.*

[222] "Floating" Prices & Lengthy Delivery Times for Fire Apparatus CSFC Members' Perspective, at 1 (Aug. 25, 2022), https://static1.squarespace.com/static/5ea64a6b9614427b0ff93e6d/t/63080a517f782438bdd6f98e/1661471313934/Floating+Prices+Lenghty+Delivery+Time+for+Fire+Apparatus+Aug+25+2022%5B42%5D.pdf   (Last visited June 5, 2026)

[223] Elizabeth Warren and Jim Banks, Letter to Edward A. Kelly General President International Associate of Fire Fighters-Seeking Information on impact of private equity roll-ups of fire truck manufacturers, consolidation on fire fighter and public safety, (April 15, 2025), https://www.warren.senate.gov/imo/media/doc/_firefighters.pdf (Last visited June 5, 2026)

[224] *Id.*

[225] *Id.*; The New York Times, "As Wall Street Chases Profits, Fire Departments Have Paid the Price," Mike Baker, Maureen Farrell, and Serge F. Kovaleski, February 17, 2025, https://www.nytimes.com/2025/02/17/us/fire-engines-shortageprivate-equity.html; BIG by Matt Stoller, "Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?," Basel Musharbash, January 25, 2025, https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll; Fire Apparatus & Emergency Equipment Magazine, "2022 Was Good for Fire Service Industry; 2023 Is

125.    However, REV Groups own filings demonstrated that "the company has reported record backlogs while simultaneously posting its highest revenues, stronger free cash flows, and rising profit margins."[226] In their FY 2023 Annual Report, the REV Group informed its 'business model produced attractive financial characteristics, including "…[the] structural ability to drive attractive levels of return on invested capital and strong revenue visibility in certain product categories with longer backlogs."[227]

126.    Because of the firetruck shortage, Fire Departments around the nation have been forced to use aging vehicles.  The Chicago Fire Department Union President Patrick Cleary stated: "You're risking people's lives…Not only the public, but fireman's lives, because the guys that go into put the fire out rely on the trucks to ventilate the building."[228]

127.    Furthermore, in a 2024-2025 budget request, LAFD Chief Kirstin Crowley informed: "The LAFD emergency fleet is in a constant state of disrepair attributable to years of deferred maintenance, deferred vehicle replacement, and the lack of resources for adequate staffing and replacement parts."[229]

---

Uncertain," Ed Ballam, December 20, 2022, https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-isuncertain/ (Last visited June 5, 2026)

[226] *Id*.; 15 REV Group. Investor & Analyst Day. Apr. 15, 2021. https://www.youtube.com/watch?v=zGXYcN_UC9Y (Last visited on June 5, 2026) Pg. 47

[227] *Id*.; 16 REV Group. FY 2023 Annual Report – Form 10-K. at 1 (2023) https://investors.revgroup.com/~/media/Files/R/RevIR/Annual%20Reports/rev-annual-report-2023.pdf (Last visited on June 5, 2026)

[228] Id.; ABC 7 Chicago, "Englewood fire station has no truck amid CFD vehicle shortage, union says: 'Risking people's lives'," John Garcia, October 6, 2024, https://abc7chicago.com/post/englewood-fire-station-has-truck-work-engine-amid-chicagodepartment-vehicle-shortage-union-leaders-say/15398616/. ( Last visited on June 5, 2026)

[229] CBS News, "Investigating claims that many LAFD trucks were not fit for service," January 10, 2025, https://www.cbsnews.com/losangeles/video/investigating-claims-that-many-lafd-trucks-were-not-fit-for-service/. (Last visited June 5, 2026)

128.     As per the aforementioned, the Senators requested the IAFF answer questions by April 2025 related to: firetruck wait times for fire truck changed; cost of a pumper or ladder truck changes; its ability to affect fire departments to budget for necessities; rise of cost of fire trucks accompanied a corresponding increase in quality of product; impact of "floating prices"; contract terms for fire truck purchases changed; dangers to fire truck backlogs pose to fire fighters and public safety; dangers of using outdated fire equipment pose to fire fighters and public safety; and others. [230]

129.     As a result, the IAFF, President Edward Kelly testified before the Senate Homeland Security and Government Affairs Subcommittee on Disaster Management "Steadily and purposefully, apparatus manufacturers have rigged the game. Taking a well-used page out of the corporate big money playbook, a small group of manufacturers have caused prices of fire engines and ladder trucks to balloon in recent years." [231] Furthermore he informed "This market manipulation has created a clear and present danger."[232] Backlogs " force fire departments to rely on aging vehicles prone to more frequent and more serious breakdowns that require costly repairs."[233]

130.     While orders spiked to 45% above average levels, order fulfillment dropped nearly 10% below average levels in 2022, as illustrated in the graph below.

---

[230] *Supra*, note 229.

[231] Ian Hoey, IAFF warns Congress over fire apparatus monopoly in US (September 12, 2025); https://internationalfireandsafetyjournal.com/iaff-warns-fire-apparatus-monopoly-us/; Kelly-Testimony.pdf (Last visited June 5, 2026)

[232] *Id.*

[233] *Id*.



***Picture 27: North American Fire Apparatus Trend[234]***

131.    In addition to delays for new fire trucks, delays have also increased for replacement part orders. Gil Carpenter, a fire chief in Benton, Arkansas, explained that prior to REV Group rolling up Ferrara, he would call a contact named Charlie whenever he needed a Ferrara replacement part. Charlie would ship him the part the next day.[235] But in 2024, when one of the department's vehicles needed new parts, delivery was delayed for more than 10 months.[236] Mr. Carpenter's fire department was left without one of its eight trucks for nearly a year.[237]

---

[234]    FAMA Releases Fire Apparatus Industry Update, FIRE ENGINEERING (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update (Last visited on June 5, 2026)

[235]    *Supra*, Note 72 at 6

[236]    Id.

[237]    supra note 92; see also Fire Apparatus & Emergency Equipment Staff, REV Group Fire Division Launches New E-Commerce Website for Fire Truck Aftermarket Parts Sales and Service, FIRE APPARATUS & EMERGENCY EQUIPMENT (July 29, 2019), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-fire-division-launches-new-ecommerce-website-for-fire-truck-aftermarket-parts-sales-and-se/ (Last visited June 5, 2026)

54

132.     Although supply chain issues plagued industries across the United States in 2021 and 2022, the Federal Reserve Bank of New York's Global Supply Chain Pressure Index returned to baseline by early 2023, hitting its lowest point on record in May 2023.[238]



*Picture 28: Global Supply Chain Pressure Index from June 30, 2017 to June 30, 2025.[239]*

133.     Such backlogs cannot be solely attributed to supply-chain disruptions following the COVD-19 pandemic or other geopolitical events of the early 2020s. FAMA members "assist in the research and development of performance-based minimum standards for fire apparatus and equipment."[240] Although FAMA does not directly set the standards, its collaboration with the NFPA means that is has "supported research required for the development of fire products, equipment, and fire truck safety…."[241] Which, in turn, demonstrates that FAMA and the Manufacturer Defendants possessed substantial industry knowledge and could readily anticipate the detrimental developments that would affect fire departments and, by extension, the broader

---

[238] Diccon Hyatt, Supply Chains Have Healed From Pandemic Disruptions, INVESTOPEDIA (June 7, 2023), https://www.investopedia.com/supply-chains-have-healed-from-pandemic-disruptions-7509263 (Last visited June 5, 2026)

[239] 5 Global Supply Chain Pressure Index (GSCPI), FED. RESERVE BANK OF N.Y. (July 2025)

[240] *Supra*, note 147.

[241] *Id.*

55

community, such as price increase, backlogs, etc. Additionally, in their meetings and part of their privy access to statistical data they were well aware of the backlogs

### 2. Manufacturer Defendants Capacity Failures Exacerbate Firetruck Backlogs

134. Under typical market conditions, such a significant surge in demand would be met with a corresponding increase in manufacturing capacity. But no such manufacturing capacity increase has materialized. REV Group has recently spent only a small portion of its revenue—about 1 percent—on upgrading its buildings and equipment. Alexander Yaggy, a former investor in REV Group's stock, called this minimal investment in the face of significant industry backlogs "reflective of an uncompetitive market."[242] And neither Oshkosh nor Rosenbauer have attempted to meet this surge in demand or capture market share by ramping up their production.

135. Manufacturer Defendants have not failed to expand their production capacity, but in some instances have actually closed existing facilities and/or plants. In September of 2021, REV Group shut down two KME custom fire truck manufacturing facilities in Pennsylvania and Virginia.[243] The closure cut the company's manufacturing footprint by roughly one third.[244]

136. In a press release, REV Group stated that orders currently in progress at the two KME facilities would be transferred to other REV Group manufacturing plants.[245] The process,

---

[242] *supra* note 92

[243] Chris Reber, KME Plant to Close in April 2022, TIMES NEWS ONLINE, (Sept. 11, 2021), https://www.tnonline.com/20210911/kme-plant-to-close-in-april-2022 (Last visited June 5, 2026)

[244] *supra* note 92.

[245] Andrew Corselli, REV Group Announces Plans to Shift KME Production to Other REV

Fire Group Facilities, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 10, 2021),

https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-announces-plans-to-shift-kme-production-to-other-rev-fire-group-facilities/ (last visited June 5, 2026)

unsurprisingly, resulted in additional, substantial delays. Matthew R. Timerman, a fire chief whose department had ordered a $1.2 million ladder truck from REV Group slated to be completed at the KME Pennsylvania plant, discovered the truck would instead be assembled at three different manufacturing sites, resulting in additional delays.[246] Eventually, Mr. Timerman received his truck more than four years after his department first placed the order.[247]

137. Despite these record-setting backlogs, the Manufacturer Defendants appear unconcerned that their customers might cancel orders or that a competitor might steal their business.[248] Mark Skonieczny, REV Group's current chief executive, explained during a 2023 conference call that the company did not expect the delays to cause cancellations because once a city sets aside the money, it is "earmarked" and REV Group gets a deposit. "That money is allocated to those units, so we feel good about that."[249] Skonieczny further commented, "I don't think it's impacting our market share."[250] According to REV Group's SEC reports, the company considers its backlog to enhance its value to shareholders by giving the company "strong visibility into future net sales."[251]

### 3. The price of fire trucks doubled

138. Unsurprisingly, given growing demand and flat or declining supply, the cost of fire trucks has soared. In the mid-2010s, a standard pumper truck cost approximately $300,000 to

---

[246] supra note 92.

[247] *Id.*

[248] Musharbash, supra note 72

[249] Supra, 24637.

[250] Eman Abu-Khaled, REV Group Takes Steps to Normalcy After Supply-Chain Setbacks, TRAILER BODY BUILDERS (Mar. 22, 2023), https://www.trailer-bodybuilders.com/truckbodies/article/21262503/rev-group-takes-steps-to-normalcy-after-supply-chain-setbacks (last visited June 5, 2026)

[251] Musharbash, supra note 11.

$500,000.[252] Within the last few years, prices have increased to an average of $1 million per pumper truck.[253] Similarly, ladder trucks that cost $750,000 to $900,000 in the mid-2010s cost upward of $2 million today.[254] An industry leader commented that the industry has "reached a new level of price psychology. Today, relationships start at a half million dollars, and 10 years ago that was a remote concept."[255]

139.     As one industry executive has observed, "[t]here are now times when all vendors at a bid table, each with a 'different' product, are all owned and managed by the same parent company. How is that competitive for the purchaser?"[256] Fire departments nationwide have few options other than to pay the exorbitant prices that Manufacturer Defendants are charging for their fire trucks.

---

[252] Id.; CHRIS GODFREY, AN EVALUATION OF FIRE APPARATUS USAGE AND OPERATING COST FOR GREEN TOWNSHIP FIRE & EMS at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188 (last visited December. 18, 2025); Patrick Varine, Despite Grant, PA Dept. Says Rising Apparatus Costs a Challenge, FIREHOUSE (Aug. 3, 2023), https://www. firehouse.com/apparatus/news/53068052/despite-fire-act-grant-export-pa-fire-department-says-rising-fire-apparatus-costs-a-challenge ("In 1994, we brought a new KME front-line pumper truck in for $200,000,' Export fire Chief and Councilman David Silvis said. 'Today, we're probably between $800,000 and $900,000 to fund this new truck.'") (last visited June 5, 2026)

[253] Musharbash, supra note 72.

[254] CHRIS GODFREY, AN EVALUATION OF FIRE APPARATUS USAGE AND OPERATING COST FOR GREEN TOWNSHIP FIRE & EMS at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188 (last visited Aug. 15, 2025); Baker, Farrell & Kovaleski, supra note92; Jody Godoy, As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited June 5, 2026, 2025); Musharbash, supra note 11.

[255] Chris Mc Loone, Fire Industry Outlook: 10 Years After the Great Recession, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 1, 2018), https://www.fireapparatusmagazine.com/fire-apparatus/fire-industryoutlook-10-years-after-the-great-recession (last visited June 5, 2026).

[256] Musharbash, supra note 72.

### 4. Defendants Conspiracy Boosted Margins and Revenues

140.    In 2024, REV Group's profit margins jumped to what the company described as an "exceptional 8.9 percent" for the division that includes fire trucks.[257]

141.    With a few exceptions during the pandemic years, overall revenues for fire truck manufacturers in the U.S., including Manufacturer Defendants, have increased significantly since 2015.[258]



*Picture 30: Fire Truck manufacturing Revenue in the United States[259]*

---

[257]  supra note 92

[258]  Connor Zaminski, Fire Truck Manufacturing in the US-Market Research Report (2015-2030) (November 2025) https://www.ibisworld.com/united-states/industry/fire-truck-manufacturing/5645/ (Last visited June 5, 2026)

[259]    Industry   Statistics   and   Trends:   market   size   and   recent   performance   (2015-2030), https://www.ibisworld.com/united-states/industry/fire-truck-manufacturing/5645/#AboutThisIndustry   (Last   visited June 5, 2026)

### F. Market Power and Barriers to Entry

#### 1. Relevant Markets

142. One tool that courts use to assess the competitive effects of concerted action is defining the relevant market. The relevant market is the zone of competition among agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). Here, the product market is all fire trucks, and the geographic market is the United States.

#### a. The product market encompasses all fire trucks

143. This case concerns fire trucks as recognized by the National Fire Protection Association ("NFPA") Standard 1900 regarding automotive fire apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing (together, the "Standards"). These standards classify fire trucks within the United States into seven types, all of which are at issue in this case: [260]

- Type 1 fire trucks are often referred to as an engine company, engine pumper, or structural firefighting truck. This is the most common type of fire truck in use today. Urban, suburban, and rural fire departments all rely on Type 1 fire trucks. Type 1 fire trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. Every Type 1 fire truck is required to have a pump with a minimum tank size of 300 gallons and to be equipped with 2.5- and 1.5-inch hoses of varying lengths. These trucks must also include a full complement of ground ladders, nozzles, forcible entry equipment, rear access and

---

[260] Types of Fire Trucks: An Overview and Comparison, PIERCE (Nov. 14, 2023), https://www.piercemfg.com/pierce/blog/types-of-fire-trucks (Last visited June 8, 2026)

egress, and some level of first aid equipment. They are designed to carry four firefighters.

- Type 2 fire trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. They are most commonly used in urban and suburban settings. They typically carry three to four firefighters.

- Type 3 fire trucks are often referred to as a wildland fire truck or a brush truck. They are typically used in rural and wildland settings. NFPA standards require a Type 3 engine to have a minimum of a 500-gallon water tank and a pump capable of a minimum of 150 US gallons per minute at a pressure of 250 pounds per square inch. Many Type 3 fire engines also feature an auxiliary pump in addition to the main water pump. The auxiliary pump can be powered by a separate diesel engine that is connected to the pump. This pump-and-roll technique means that a truck operator can drive the truck while crew members man the pump and hoses, allowing firefighters to follow along as forest fires and brush fires move with the weather, and to create fire lines, wetting down areas ahead of an advancing wildfire. Type 3 Fire Engines must be equipped to carry at least three passengers.

- Type 4 fire trucks, like Type 3 trucks, are often used in wildland firefighting. Compared to Type 3 trucks, Type 4 trucks have a larger water tank and reduced hose capacity requirements. Type 4 fire trucks must have a 750-gallon water tank that offers 50 gallons per minute of water transfer at a pressure of 100 pounds per square inch. Type 4 trucks must be equipped to carry at least two people.

- Types 5, 6, and 7 fire trucks are often grouped together because they feature many of the same design qualities. These vehicles are typically pick-up truck-based with 4-wheel drive on a medium duty chassis. The main difference between Type 5, Type 6, and Type 7 fire trucks is the difference in their maximum gross vehicle weight rating ("GVWR"): Type 5 trucks have a maximum GVWR of 26,000 pounds; Type 6 trucks have a maximum GVWR of 19,500 pounds, and Type 7 trucks have a maximum GVWR of 14,000 pounds. Type 5, 6, and 7 trucks typically carry a 300-gallon water tank and a small booster pump with a minimum capacity of 50 gallons per minute. They must be equipped to carry two firefighters.



| SPECS | STRUCTURE | | WILDLAND BRUSH TRUCKS | | | | |
|---|---|---|---|---|---|---|---|
| | TYPE 1 | TYPE 2 | TYPE 3 | TYPE 4 | TYPE 5 | TYPE 6 | TYPE 7 |
| TANK MIN. CAPACITY (GAL.) | 300 | 300 | 500 | 750 | 400 | 150 | 50 |
| PUMP MIN. FLOW (GPM) | 1000 | 500 | 150 | 50 | 50 | 50 | 10 |
| @ RATED PRESSURE (PSI) | 150 | 150 | 250 | 100 | 100 | 100 | 100 |
| HOSE 2½" (MIN. FT) | 1200 | 1000 | ✕ | ✕ | ✕ | ✕ | ✕ |
| HOSE 1½" (MIN. FT) | 500 | 500 | 1000 | 300 | 300 | 300 | ✕ |
| HOSE 1" (MIN. FT) | ✕ | ✕ | 500 | 300 | 300 | 300 | 200 |
| LADDERS | ✓ | ✓ | ✕ | ✕ | ✕ | ✕ | ✕ |
| PUMP AND ROLL | ✕ | ✕ | ✓ | ✓ | ✓ | ✓ | ✓ |
| MAX. GVWR (LBS) | ✕ | ✕ | ✕ | ✕ | 26,000 | 19,500 | 14,000 |
| PERSONNEL (MIN.) | 4 | 3 | 3 | 2 | 2 | 2 | 2 |
| TYPICAL USES | STRUCTURAL FIRE RESPONSE | STRUCTURAL FIRE RESPONSE | BRUSH FIRE RESPONSE | BRUSH FIRE RESPONSE | INITIAL ATTACK, BRUSH PATROL | INITIAL ATTACK, BRUSH PATROL | PATROL, MOP UP, INITIAL ATTACK |

✓ REQUIRED   ✕ NOT REQUIRED/OPTIONAL

**Picture 31: Firetruck types and specifications[261]**

144.    Some trucks are specially equipped to conform to additional standards. For example, NFPA Chapter 5 describes the requirement for a truck to be considered a Pumper Fire

---

[261] BOISE MOBILE EQUIPMENT, Types of Fire Trucks and Their Purpose (Feb. 21, 2022), https://www.bmefire.com/types-of-fire-trucks (last visited June 5, 2026)

Apparatus, NFPA Chapter 9 describes the requirements for a Quint Fire Apparatus, NFPA Chapter 11 describes the requirements for a Mobile Foam Fire Apparatus, and NFPA Chapter 19 describes the requirements for Aerial Fire Apparatus (which include trucks equipped with aerial ladders, elevating platforms or towers, and water tower devices). [262] These specialty trucks are also included in the relevant product market.

### b. The geographic market is the United States

145. As described above, all Manufacturer Defendants sell fire trucks to fire departments across the 50 states. The relevant market is the United States.

### 2. Manufacturer Defendants Possess Market Power in Relevant Market

146. As a result of industry roll-ups from the mid-2010s through today, the overwhelming majority of the fire truck industry's sales and capacity are now concentrated among three dominant manufacturers: REV Group, Oshkosh, and Rosenbauer. As described above, REV Group captures around $1 billion of annual fire truck sales made in the United States, Oshkosh captures around $750 million, and Rosenbauer captures around $307 million. In combination, these three companies capture between 70 and 80 percent of the national market.[263]

### 3. Significant Barriers to Entry in the Fire Truck Manufacturing Market Shield Defendants Market Share

147. Fire trucks are expensive, made-to-order, specialty equipment. End-users can specify nearly every aspect of the apparatus they order, from the size of the motor, to the placement of emergency lights, to the location of equipment storage compartments.

---

[262] 5 PIERCE, Types of Aerial Fire Trucks: NFPA Classification Overview (Nov. 8, 2022), https://www.piercemfg.com/pierce/blog/types-of-aerial-fire-truck (Last visited June 5, 2026)

[263] *supra* note92.

148. This demand for customization stems from the diversity of the customer base. According to the U.S. Fire Administration, there are approximately 30,000 fire departments in the United States, ranging from large urban departments to small rural agencies.[264] Among these departments, 68 percent have a single fire station, 17 percent have two stations, and 15 percent have three or more stations.[265] In total, there are approximately 52,000 fire stations across the country.[266] As Kent Tyler, president of REV Group's Fire Group put it, "[t]hese are fully custom trucks, and they don't just happen overnight."[267] What's more, fire departments buy new trucks infrequently, on average every 10 to 15 years.[268] Only about 10,000 fire trucks are manufactured each year.[269]

149. Given this backdrop, breaking into the fire truck industry is challenging. The cost of producing fire trucks, combined with the long lead times, mean that only well-funded, established corporations have much chance of sustaining themselves through the initial investment period. The large capital outlays required limit market entry, as it can be difficult for firms to raise the required funds.

---

[264] U.S. FIRE ADMIN., National Fire Department Registry Quick Facts (Aug. 11, 2025), https://apps.usfa.fema.gov/registry/summary. There are 27,098 fire departments listed with the National Fire Department Registry, which accounts for 91% of all U.S. fire departments. (Last visited June 5, 2026)

[265] *Id.*

[266] *Id.*

[267] Chris Mc Loone, REV Group Invests in the Strength of Fire Apparatus Brands, FIRE APPARATUS & EMERGENCY EQUIPMENT (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands (Last visited June 5, 2026)

[268] *supra* note 92

[269] *Id.*

64

### G. Plaintiff has been harmed as a result of the conspiracy

#### 1. Plaintiff has overpaid for fire trucks as a result of Defendants' anticompetitive behavior.

150.     If the price of fire trucks had increased only at the rate of inflation between 2015 and 2025, pumper trucks would cost approximately $680,000 (rather than the current cost of $1 million), and ladder trucks would cost approximately $1.2 million (rather than $2 million).[270] Municipalities across the country are therefore paying approximately 47 percent (or $320,000) more for pumpers and 66 percent (or $800,000) more for ladder trucks in 2025 than would be expected based on inflationary costs alone.

151.     There are approximately 5,000 new fire trucks sold in the United States every year.[271] Of these, about 75% are pumpers.[272] That means that since 2016, Plaintiff, as well as others, have paid a combined total of approximately $56.25 billion for new fire trucks[273]—$19.8 billion more than expected based on increased inflation alone.[274]

152.     Even accounting for issues facing the fire truck market in terms of supply chain and labor shortage challenges, these increases are far beyond what would be expected in a competitive market.

---

[270] Calculated assuming a pumper cost $500,000 and a ladder truck cost $900,000 in 2015

[271] Jeffrey Bonior, Get to Know Sutphen, Which Has Been Making Fire Engines in the United States Since 1890, SUTPHEN (Mar. 12, 2021), https://www.sutphen.com/get-to-know-sutphen-which-has-been-making-fire-engines-in-the-united-states-since-1890/  (Last visited on June 5, 2026)

[272] Alan M. Petrillo, What's the Right Size Pump for Your Apparatus and How Does It Affect the Design?, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 27, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/pumpers/whats-the-right-size-pump-for-your-apparatus-and-how-does-it-affect-the-design/  (Last visited on June 6, 2026)

[273] Calculated as ((3,750 pumper trucks per year * 9 years *$1 million) + (1,250 ladder trucks per year * 9 years * $2 million)).

[274] Cost based on inflation alone ($36.45 billion) calculated as ((3,750 pumper trucks per year * 9 years *$680,000) + (1,250 ladder trucks per year * 9 years * $1.2 million))

### 2. Inflated Prices and backlogs Delay Fire Trucks Flee Replacement for Plaintiff

153. Even accounting for issues facing the fire truck market in terms of supply chain and labor shortage challenges, these increases are far beyond what would be expected in a competitive market.

154. Fire vehicles age, they become prone to more frequent and serious breakdowns, leading to more costly repairs and prolonged downtime. The National Fire Protection Association recommends that apparatus should be moved from the frontlines to the reserve fleet after 15 years and removed from service completely at the 20- or 25-year mark.

155. Skyrocketing prices and longer delivery times have made it difficult for municipalities to replace aging vehicles in their fire departments' fleets in a timely manner. In many cases, fire departments are operating using trucks that have exceeded their service life because buying new trucks is prohibitively expensive. According to the president of the International Association of Fire Fighters, Edward Kelly, cities and towns across the country are facing a crisis where demand for new fire trucks has outstripped availability and funding.[275]

156. Other examples of aging fleets abound. In January 2025, the Chicago fire department threw a mock thirtieth birthday celebration for one of its trucks, which was older than many firefighters on the force:

---

[275] Jody Godoy, As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13/ (Last visited on June 5, 2026)



*Picture 32: Celebration of Chicago Fire Department Truck D545's 30th birthday[276]*

157.    In Los Angeles, the city's fire department has long aimed to have 90 percent of its fleet ready for deployment at any given time, but it has averaged only 78 percent in recent years as older trucks are pulled for maintenance.[277] Union officials have said that rising prices for replacement vehicles have forced the department to order fewer new rigs than it had planned.[278]

158.    Auditors in Atlanta found that more than a third of the city's aging firefighting fleet was out of commission.[279] Houston and Seattle have reported similar struggles with their fleets.[280]

---

[276] Katherine Laidlaw, Why Does a Fire Truck Cost $2 Million?, HUSTLE (July 18, 2025), https://thehustle.co/originals/why-does-a-fire-truck-cost-2-million (last visited June 5, 2026)

[277] *supra* note 92

[278] Mike Baker, Senators Investigate Private Equity Role in Soaring Fire-Truck Costs, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (Last visited June 5, 2026)

[279] Baker, Farrell & Kovaleski, supra note 92; Riley Bunch, City Leaders Reveal Plans to Address Aging Fire Trucks, ATLANTA JOURNAL-CONSTITUTION, (Aug. 19, 2024), https://www.ajc.com/news/atlanta-news/city-leaders-reveal-plans-to-address-aging-fire-trucks/YGFTTY7ZPRBPJP54Z2RYDMXLOA/ (Last visited June 5, 2026)

[280] Christy Grimes, Houston Fire Department Navigating Supply Chain Hurdles with Fleet Replacements, GOV'T FLEET (Sept. 11, 2023), https://www.government-fleet.com/10206016/houston-fire-department-to-replace-aging-vehicles; David Kroman, Seattle Firetruck Fleet Deteriorating Faster than Repairs Can Keep Up, SEATTLE

159.     Smaller municipalities, including towns in Connecticut, Illinois, Michigan, New York, New Jersey, Pennsylvania, Texas, Kansas, and West Virginia, have faced comparable difficulties.[281] For example, in 2024, the city of Evanston, Illinois had to persuade a dealer to sell a demonstration vehicle to accelerate delivery of a $2.3 million new truck to only "12 to 14 months" to replace an 18 year old reserve truck with "major defects… that would cost around $300,000 to fix."[282] The Chief of the Ann Arbor, Michigan fire department recently observed that "[t]he price of fire trucks has become bonkers," revealing "almost a monopoly market," such that their next truck will cost $2.4 million and take 4 years to deliver.158 And the fire chief of Watertown, New York, has said his department was so desperate for a new ladder truck to keep operations running that it bought one used from another city, even though that truck was already more than two decades old.[283]

### 3. Smaller Fire Trucks Fleets Impair Disaster Response

160.     High prices and long waits for fire apparatus are endangering public safety in communities across the country, particularly those facing natural disasters.

161.     Los Angeles's experience in January 2025, when two large fires raged for days and killed 29 people, is a particularly poignant example of the harm communities can suffer when their

---

TIMES (Apr. 1, 2024), https://www.seattletimes.com/seattle-news/politics/seattle-fire-truck-fleet-deteriorating-faster-than-repairs-can-keep-up/ (Last visited on June 5, 2026)

[281] CBS NEWS, North Texas Fire Department in Crisis Needs Financial Windfall To Overcome Equipment Challenges (Jan. 23, 2025), https://www.cbsnews.com/texas/video/north-texas-fire-department-in-crisis-needs-financial-windfall-to-overcome-equipment-challenges); Allen Clayton, City of Clarksburg Approves $3.1 Million to Purchase New Fire Trucks, 12WBOY (Feb. 29, 2024), https://www.wboy.com/news/harrison/city-of-clarksburg-approves-3-1-million-to-purchase-new-fire-trucks, Musharbash, supra note 11; Baker, Farrell & Kovaleski, supra note 92(Last visited June 5, 2026)

[282] Bill Smith, Council OK's Fire Truck Buy, EVANSTON NOW (Mar. 26, 2024), https://evanstonnow.com/council-oks-fire-truck- 158 Ryan Stanton, Ann Arbor Is Getting a New Fire Truck, But It Will Take 4(Last visited June 5, 2026)

[283] Baker, Farrell & Kovaleski, supra note 92.

fire truck fleets are reduced.[284] More than 100 of the Los Angeles Fire Department's ("LAFD") 183 fire trucks were out of service at the time the fires broke out.[285] Chuong Ho, a firefighter and union leader who was among those who reported for work during the fires, said the lack of fire apparatus meant many of the firefighters who were available to help that day could not be sent to the front lines.[286] Kristin Crowley, the LAFD fire chief, confirmed that the lack of a fully staffed fire truck fleet impeded the department's ability to respond to the fires.[287] Had additional firefighters been able to combat the blazes, they might have been able to prevent the devastation that followed, including $350 million in damage to L.A. public facilities[288] and the loss of homes and lives.[289]

---

[284] Jody Godoy, As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust

Probe, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13/ (Last visited June 5, 2026)

[285] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJre-Firetrucks.pdf (Last visited June 5, 2026)

[286] Baker, Farrell & Kovaleski, supra note92.

[287] Id.

[288] David Zahniser, Fires and Windstorms Caused at Least $350 Million in Damage to L.A. Public Facilities, Report Says, L.A. TIMES (Jan. 22, 2025), https://www.latimes.com/california/story/2025-01-22/la-me-wildfire-costs-los-angeles-public-infrastructure (Last visited June 5, 2026)

[289] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 3 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJre-Firetrucks.pdf (Last visited June 5, 2026)

69



**Picture 33: Over 75 firefighting trucks and engines are lined up, unused and awaiting repair or maintenance at a Los Angeles facility while wildfires continue to rage across the city[290]**

162.  Other communities have faced similar difficulties. Jesse M. Flax, the fire chief in Camden, New Jersey, said that fire truck manufacturing delays and rising prices were "creating greater risk for the public and firefighters."[291] During a 2024 house fire in Camden, crews were slowed in their response by mechanical trouble on a truck that caused its hose to go limp. A resident died in that blaze.[292] And in Castle Rock, Colorado, firefighters responded to incidents in Type 3

---

[290]  Dana Kennedy, 75 Los Angeles fire trucks wait for repairs as wildfires reage-while city sepnds $1.3 B on the homeless. NY Post. Dozens of Fire Trucks Waiting for Repair while Fires Ravage LA, DAILY MAIL (Jan. 16, 2025), https://nypost.com/2025/01/16/us-news/75-los-angeles-fire-trucks-in-need-of-repair-sat-idle-as-wildfires-raged/ (Last visited June 5, 2026)

[291]  Baker, Farrell & Kovaleski, supra note 92

[292]  *Id.*

brush trucks, rather than in other preferred vehicles, due to a four-year delivery delay of new apparatus.[293]

**4. Plaintiff has diverted funds to fire trucks purchases, harming anticompetitive conduct.**

163. In addition to problems adequately responding to disasters with diminished fleets, the rising cost of fire truck maintenance and replacement has squeezed fire departments' and municipalities' budgets, leaving them with fewer resources for other needs including recruiting and retaining firefighters.[294] For example, cities whose fire departments are facing budget challenges, including those in Spokane, Washington and Mills, Wyoming, have had to cancel essential training and even lay off firefighters.[295]

**H. Defendants actively concealed the conspiracy, and Plaintiff could not discover their anticompetitive product.**

164. Plaintiff had neither actual nor constructive knowledge of the facts constituting its claim of relief. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy until shortly before filing this Complaint. Defendants engaged in a covert conspiracy and failed to reveal facts that would have placed Plaintiff on inquiry notice that a price-fixing scheme for fire trucks existed. Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

---

[293] Isabelle Crow, IAFF Spotlight Apparatus Crisis and Its Impact, FIRE & SAFETY J. (June 20, 2025) https://fireandsafetyjournalamericas.com/iaff-spotlight-apparatus-crisis-and-its-impact (Last visited June 5, 2026)

[294] Musharbash, supra note 46

[295] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (Last visited June 5, 2026)

71

165.    Defendants hid their conspiracy by sharing competitively sensitive information among themselves through FAMA statistical reports that not accessible to the public.  They further took part in members-only discussions at FAMA's biannual meetings, which allowed them to communicate privately.  Because the public could not access either the FAMA reports and surveys or the restricted portions of the FAMA meetings, Plaintiff had no basis to suspect that Defendants were engaged in an unlawful, anticompetitive scheme.

166.    What's more, Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Fire trucks are not exempt from antitrust regulation. Prior to the investigative articles by Basel Musharbash [296] and journalists with the New York Times, [297] Plaintiff reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Manufacturer Defendants' fire truck prices before these recent events.

167.    Because Defendants fraudulently concealed their wrongful conduct, the statute of limitations has been tolled and remains suspended as to all claims and causes of action Plaintiff possesses arising from the unlawful conspiracy described in this Complaint.

---

[296] Musharbash, supra note 72

[297] Baker, Farrell & Kovaleski, supra note 92.

## COUNT I
### Violations of Section 1 of Sherman Act, 15 U.S.C. §1- Conspiracy to Restrict Production

168.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

169.    Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. To state a claim, a plaintiff must allege: (1) the existence of a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade; and (3) that the restraint affected interstate commerce. *See Dahl v. Bain Capital Partners, LLC, 937 F. Supp. 2d 119, 134 (D. Mass. 2013)*. Section 1 applies only to concerted action among independent actors, not unilateral conduct. *See American Needle,Inc. V. Nat'l Football League, 650 U.S. 183 (2010).*

170.    A conspiracy to restrict production constitutes an unreasonable restraint of trade where competitors agree to limit output, capacity, or supply in order to elevate prices or otherwise distort market conditions. Such agreements are analyzed under either the *per se* rule or the rule of reason, depending on their nature. *See United States v. Delta Dental of R.I., 943 F. Supp. 172, 185-86 (D.R.I. 1996).*

171.    Horizontal agreements among competitors to restrict output may be deemed unlawful *per se* where they are inherently anticompetitive and lack any redeeming justification. *See Ohio v. Am. Express Co., 138 S. Ct. 2274, 2283–84 (2018) ;Hayter Oil Co., 51 F.3d at 1273; Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc., 441 U.S. 1, 8 (1979); See also Office of Gen. Counsel, U.S. Sent'g Comm'n, Primer on Antitrust Offenses 1, 8 (2023).* Under the *per se* rule, such conduct is conclusively presumed to restrain trade, and plaintiffs need not plead or prove actual anticompetitive effects.

73

172. Alternatively, where the conduct is not treated as *per se* unlawful, courts apply the rule of reason, which evaluates whether the challenge agreement is one that promotes competition or one that suppresses competition. *See NCAA v. Bd. Of Regents of University, 468 U.S. 85,134 (1984); Nat'l Soc'y o Pro. Eng'rs v. United States, 435 U.S. 679, at 692 (1978).*

173. The existence of concerted action may be established through direct or circumstantial evidence demonstrated by a coordinated scheme among competitors. *See Monsanto Co. v. Sray-Rite Serv. Corp 465 US 752, at 764-765 (1984)*

174. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016 and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price of fire trucks in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

175. In formulating and carrying the alleged agreement, understanding, and conspiracy, Defendants achieved the following conspirational outcomes:

    a. Fixing, raising, stabilizing, or maintaining the prices they charged for fire apparatus in the United States at artificially high levels;

    b. Restrict the manufacturing capacity and output of fire apparatus sold in the United States; and

    c. Exchange competitively sensitive information, causing anticompetitive effects without sufficient procompetitive justifications.

176. Defendants' anticompetitive conduct had the following effects, among others:

    o Competition among Defendants has been restrained or eliminated with respect to fire apparatus;

- The prices of fire apparatus have been fixed, stabilized, maintained or increased at artificially high levels; and

- Plaintiff has been deprived of the benefits of free and open competition between and among Defendants.

177. Defendants acted knowingly, intentionally, and in concert to restrain trade in the fire truck market.

178. Defendants collectively possess substantial market power, controlling approximately 70-80% of the US Fire Truck market.

179. Defendants benefited financially from the conspiracy.

180. Plaintiff was forced to pay supercompetitive prices for new fire trucks.

181. Long delays prevented timely replacement of aging vehicles, forcing departments to operate trucks well past recommended service lives, resulting in increased maintenance costs, breakdowns, and diminished fleet availability.

182. This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a quick look or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid precompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

183. Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for fire apparatus throughout the United States.

184. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff was injured in their business or property and will continue to be injured by paying artificially inflated prices for fire apparatus they would not otherwise have paid absent Defendants' conduct.

75

185.     Plaintiff is entitled to treble damages, attorney's fees and costs, and an injunction relief against Defendants to end the alleged ongoing violations.

186.     Plaintiff did not and could not have discovered the conspiracy through reasonable diligence until shortly before filing.

187.     Defendant's conduct constituted as per se violation of Section 1 of the Sherman Act as a horizontal price fixing and output-restriction agreement.

### COUNT II:
### Violation of Section 1 of the Sherman Act, 15 U.S.C. §1- Conspiracy to Exchange Competitive Information

188.     Plaintiff incorporates and realleges, as through fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

189.     Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States…." 15 U.S.C. § 1. To state a claim, a a plaintiff must allege: (1) the existence of a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade; and (3) that the restraint affected interstate commerce. *See Dahl v. Bain Capital Partners, LLC, 937 F. Supp. 2d 119, 134 (D. Mass. 2013)*. In evaluating whether a restraint is effected by combination or conspiracy in violation of §1 "the crucial question' is whether the challenged anticompetitive conduct stem[s] from [an] independent decision or from an agreement, tacit or express." *See Theatre Enters., Inc. v Paramount Film Distrib. Corp., 346 U.S. 537, 540, 74 S. Ct. 257,98 L. Ed. 273 (1954); Evergreen Partnering Group Inc v. Pactiv Corp 720 F.3d 33 , at 43-44 (2013)* , 720 F.3d at 43. An agreement may be found when "the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds un an unlawful agreement." *See Copperweld Corp. v. Indep. Tube Corp, 467 U.S. 752,*

76

*104 S. Ct. 2731 (1984); Evergreen Partnering Group Inc v. Pactiv Corp 720 F.3d 33 , at 43-44 (2013)*

190.     Concerted exchanges of competitively sensitive information among horizontal competitors can constitute an unreasonable restraint of trade where such exchanges reduce uncertainty, facilitate coordination, or otherwise suppress competition. Courts recognize that agreements to share non-public pricing, output, or strategic data may support an inference of collusion, particularly where such exchanges would not occur absent a prior understanding among competitors. *See In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 250-51 (D. Mass. 2014).

191.     Because direct evidence of agreement is rarely available, plaintiff may rely on circumstantial evidence and "plus factors" to establish a conspiracy under Section 1. Such plus factors include coordinated conduct, parallel behavior inconsistent with independent self-interest, and the exchange of competitively sensitive information that tends to exclude the possibility of independent action. *See Evergreen*, 720 F.3d at 43-44; *Nexium*, 42 F. Supp. 3d at 250-51.

192.     Accordingly, where competitors engage in structured, ongoing exchanges of non-public competitive information that reduce uncertainty and facilitate coordinated pricing, output, or strategic decisions, such conduct constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

193.     At least as early as January 1, 2016, and continuing through the present, Defendants conspired to exchange sensitive, non-public economic and operational information about their fire truck business. These exchanges were part of a continuing agreement among competitors to suppress competition, which constituted an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

194. The relevant product market is firetrucks as recognized by NFPA Standard 1900 regarding automotive fire apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing. The relevant geographic market in the United States.

195. Manufacturer Defendants possess market power in the relevant market. Manufacturer Defendants control between 70 and 80 percent of the relevant market. Manufacturer Defendants' collective market power includes the power to artificially deflate the number of fire trucks produced in the United States below competitive levels and to artificially inflate the price Plaintiff paid.

196. An increase in the price of fire trucks could be imposed collectively by Defendants without losing customers. The fire truck market is a unique product market.

197. The information regularly exchanged by Defendants pursuant to the agreement consisted of detailed, competitively sensitive and non-public economic information. The information exchanges included FAMA Statistical Reports and FAMA meetings.

198. Manufacturer Defendants' regular information exchanges through FAMA reflected concerted action between competitors in the market for fire trucks.

199. Each Manufacturer Defendant furnished competitively sensitive information to other Manufacturer Defendants through FAMA with the understanding that it would be reciprocated. FAMA enforced this understanding by requiring Manufacturer Defendants to share data in order to receive comparable data.

200. The agreement to regularly exchange detailed and non-public economic information about their companies suppressed competition between Manufacturer Defendants.

201. When Defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly, Manufacturer Defendants

used the data obtained through FAMA to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the fire truck market. This strategic information was a material factor in Manufacturer Defendants' decisions to inflate the priced that Plaintiff paid for fire trucks.

202. Defendant's unlawful agreements to exchange, and the actual exchanges of nonpublic, timely, and detailed data were not reasonably necessary to further any procompetitive purposes.

203. The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Manufacturer Defendants in the market for fire trucks in the United States, and (2) inflating the prices of fire trucks.

204. As a result of the unlawful agreement alleged herein to exchange information, Plaintiff was injured in its business or property by paying artificially inflated prices for fire trucks.

### COUNT III
### Violation of Massachusetts Antitrust Law, Mass. Gen. Laws Ch. 93, § 4

205. Chapter 93 of the Massachusetts General law declares unlawful "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the commonwealth…" The Massachusetts Antitrust Act applies to conduct that takes place in or has a significant impact on trade or commerce within the Commonwealth. See *Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*, 438 Mass. 459, 781 N.E.2d. 787 (2003); *First Marblehead Corp v. House*, 473 Mass. 42, 38 N.E.3d 1089 (2015).

206. Plaintiff incorporates and realleges each and every allegation set forth above as if fully set forth herein.

207. As set forth above in Count I and II, Defendants, under section 2 of the Sherman Act. Accordingly pursuant to Ch. 93 § 1 of the Massachusetts General Laws, Defendants have violated the Massachusetts Antitrust Act.

208. Defendants transacted business in Massachusetts and directed their pricing and sales of fire trucks into Massachusetts, resulting in Plaintiff purchasing fire apparatus at artificially inflated prices, supercompetitive prices within the Commonwealth.

209. Therefore, Defendants are liable to Plaintiff for damages in the amount to be proven at trial.

## COUNT IV
### Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A §1, §§ 2 and 11 Et Seq.

210. Chapter 93A of the Massachusetts General Laws prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…." Mass. Gen. Laws ch. 93A, § 2(a). Courts interpret this provision in accordance with the Federal Trade Commission Act and related federal precedent. *McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 775 F.3d 109, 122 (1st Cir. 2014). Conduct is considered unfair or deceptive if it falls within the penumbra of established concepts of unfairness, is immoral, unethical, oppressive, or unscrupulous, and causes substantial injury to consumers or businesses. *Famm Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 107 (1st Cir. 2009).

211. To state a claim under Chapter 93A, § 11, a plaintiff must allege that: (1) the defendant engaged in an unfair or deceptive act or practice; (2) the plaintiff suffered a loss of money or property; and (3) the defendant's conduct caused that loss. *Anoush Cab, Inc. v. Uber Techs., Inc.*, 8 F.4th 1, 16 (1st Cir. 2021). The challenged conduct must occur "primarily and

substantially within the commonwealth," although the burden of proving otherwise rests with the defendant. Mass. Gen. Laws ch. 93A, § 11; *Hamann v. Carpenter*, 937 F.3d 86, 93 (1st Cir. 2019).

212. The statute is broadly construed to reach unfair or deceptive practices in business transactions, including claims arising from the marketing, sale, or distribution of goods, even in the absence of direct privity between the parties. *Rafferty v. Merck & Co.*, 479 Mass. 141, 161, 92 N.E.3d 1205, 1223 (2018).

213. In determining whether conduct occurred "primarily and substantially" in Massachusetts, courts consider, among other factors, where the defendant committed the alleged unfair acts, where the plaintiff received and acted upon the conduct, and where the plaintiff suffered its losses. *KPS & Assocs., Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 24 (1st Cir. 2003). Where, as here, defendants engage in unfair or deceptive practices that cause economic injury to purchasers within Massachusetts, such conduct falls within the scope of Chapter 93A.

214. Plaintiff incorporates and realleges each and every allegation set forth above as if fully set forth herein.

215. At least as early as January 1, 2026, and continuing through the present, Defendants have engaged in trade or commerce within the meaning of Mass. Gen. Laws ch. 93A, § 2, including the manufacture, marketing, sale, and distribution of fire trucks to municipalities, including within the Commonwealth of Massachusetts.

216. Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 11 by, among other things, conspiring to suppress fire truck production, exchange competitively sensitive information, and artificially inflate prices.

217. Defendants' conduct, as alleged herein, was immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to Plaintiff.

218. Defendants knowingly and intentionally participated in a coordinated scheme to raise prices and restrict output of fire trucks sold to municipalities, including those located in Massachusetts, resulting in supercompetitive pricing and prolonged delivery delays.

219. Defendants' conduct had the purpose and effect of eliminating competition, reducing supply, and increasing prices, thereby depriving Plaintiff of the benefits of a competitive market.

220. As a direct and proximate result of Defendants' unfair and deceptive conduct, Plaintiff suffered injury, including but not limited to overpayment for fire trucks and delayed access to essential emergency equipment.

221. Defendants' unfair and deceptive conduct occurred primarily and substantially within the Commonwealth of Massachusetts, including through sales to Massachusetts municipalities, the imposition of inflated prices on those purchases, and the resulting economic injuries suffered within the Commonwealth.

222. Defendants' conduct was willful and knowing, entitling Plaintiff to recover multiple damages pursuant to Mass. Gen. Laws ch. 93A, § 11.

223. As a result of Defendants' violations of Chapter 93A, Plaintiff is entitled to recover damages, including treble damages, as well as attorneys' fees, costs, and such other relief as the Court deems just and proper.

## COUNT V
## Unjust Enrichment

224. Unjust enrichment is an equitable doctrine that prevents a defendant from retaining a benefit conferred by the plaintiff where it would be inequitable to do so without payment. To

82

state a claim, a plaintiff must allege: (1) a benefit conferred upon the defendant; (2) the defendant's knowledge or appreciation of that benefit; and (3) the defendant's acceptance or retention of the benefit under circumstances that make such retention inequitable. *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009); *Tomasella v. Nestlé USA, Inc.*, 962 F.3d 60, 82 (1st Cir. 2020); *Alantra LLC v. Apex Indus. Techs. LLC*, 636 F. Supp. 3d 223, 235 (D. Mass. 2022).

225.    Unjust enrichment is an equitable remedy grounded in principles of fairness and morality and is available where the defendant's retention of a benefit would defeat the reasonable expectations of the parties. *Metro. Life Ins. Co. v. Cotter*, 464 Mass. 623, 644, 984 N.E.2d 835, 850 (2013); *Bonina v. Sheppard*, 91 Mass. App. Ct. 622, 625, 78 N.E.3d 128, 132 (2017). While unjust enrichment does not apply where a valid and enforceable contract governs the same subject matter, it may be pled in the alternative where the existence or scope of such a contract is disputed. *Mass. Eye & Ear Infirmary*, 412 F.3d at 233-34 (1st Cir. 2005); *Alantra*, 636 F. Supp. 3d at 236.

226.    Defendants have received and retained substantial financial benefits as a result of the unlawful conduct alleged herein, including revenues derived from the sale of fire apparatus at supercompetitive and artificially inflated prices.

227.    Plaintiff conferred a direct benefit upon Defendants by purchasing fire apparatus at prices that were higher than those that would have prevailed in a competitive market absent Defendants' unlawful agreement and conduct.

228.    Defendants' retention of these benefits is unjust because it arises from their participation in unlawful anticompetitive conduct, including agreements in restraint of trade in violation of applicable antitrust laws, including Massachusetts state and parallel federal antitrust laws.

229. Plaintiff reasonably expected that it was paying competitive market prices, and not prices inflated through collusion or other unlawful anticompetitive conduct.

230. Plaintiff seeks remedy in equity that Defendants disgorge the profits and benefits they have unjustly obtained, and that restitution be awarded to them.

**ANTRITRUST INJURY**

231. Plaintiff has suffered substantial antitrust injury as a direct and foreseeable result of Defendants' conspiracy, from at least January 1, 2016, to the present, to fix, raise, and stabilize the prices of fire trucks sold to local and municipal fire departments.

232. Defendants, who manufacture and sell fire trucks nationwide, coordinated their pricing and output decisions to eliminate competition and maintain supra-competitive prices.

233. As a result, Plaintiff paid artificially inflated prices for fire trucks, causing direct financial harm to their budgets and reducing funds available for other critical fire department operations and services.

234. These injuries are precisely the type of economic harm the Sherman Act was designed to prevent and flow directly from Defendants' unlawful restraint of trade.

235. As a result of Defendants' unlawful conduct, Plaintiff is entitled to recover damages for the injuries they have suffered.

236. For this reason, applicable limitations of actions and claims, at law or in equity, asserted herein or any statute of limitations that otherwise may apply to the claims of Plaintiff should be tolled.

<u>**REQUEST FOR RELIEF**</u>

**WHEREFORE**, Plaintiff respectfully requests judgement against Defendants as follows:

A. The acts of Defendants are illegal and unlawful, including the agreement, contract, combination or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a per se violation (or, alternatively, illegal under a quick look or rule of reason analysis) of Section 1 of the Sherman Act (15 U.S.C. § 1) and Massachusetts General Antitrust Law.

B. Plaintiff recover damages sustained by it, as provided by the federal and state antitrust laws, and that a judgment in favor of Plaintiff be entered against Defendants in an amount to be trebled to the extent such trebling is permitted pursuant of such laws;

C. Find that the Defendants participated in unfair and deceptive competition and unlawful and unfair and deceptive business acts and practices in violation of M.G.L. 93A;

D. Plaintiff recover disgorgement-related relief to the extent such relief is afforded by any of the aforementioned laws;

E. Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose of effect, and from adopting or following any practice, plan or program, or device having a similar purpose or effect;

F. Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act

85

on their behalf, be permanently enjoined and restrained from in any manner continuing the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications;

G. Plaintiff be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint;

H. Plaintiff and recover its costs of this suit, including reasonable attorneys' fees and expenses, including costs of experts; and

I. Plaintiff receive such other or further relief as may be just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: June 8, 2026          Respectfully submitted,
       Clinton, MA


**NAPOLI SHKOLNIK**

*/s/Harold P. Naughton, Jr.*
10 Nelson Street,
Clinton, MA 01510
Tel.: (978) 852-3643
*Counsel for Plaintiff*